ALESSIO AZZARI, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 27532–08L.　　Filed February 24, 2011.

P's business experienced financial difficulties and cashflow problems, and P fell behind on its Federal employment tax deposits. P later received financing from a lender which made loans secured by an interest in P's accounts receivable. The lender's financing helped P remain current with its tax deposits for six consecutive quarters. During that time, R filed a notice of Federal tax lien (NFTL) for the tax P still owed. P's lender refused to extend any more credit to P because of the NFTL unless R agreed to subordinate the NFTL to the lender's security interest. P requested that R subordinate the NFTL and grant it an installment agreement to satisfy its tax liabilities. Because the lender's security interest antedated the NFTL, R determined that the lender's security interest already had priority in P's accounts receivable and that it was unnecessary to subordinate the NFTL. In part on account of its inability to borrow against its accounts receivable because of the NFTL, P again fell behind on its employment tax deposits, and R therefore refused to consider P's proposed installment agreement. *Held*: It was an abuse of discretion for R to refuse to consider P's request to subordinate the NFTL on the basis of R's erroneous conclusion of law that the lender's security interest already had priority over the NFTL in P's accounts receivable. *Held*, *further*, it was an abuse of discretion for R to deny P's request for an installment agree-

ment on the basis of P's failure to stay current on its tax deposits where R's abuse of discretion in refusing to consider subordination of the NFTL to P's lender's security interest contributed to P's falling behind on its tax deposits and where R did not allow P the opportunity to become current again.

*Barry A. Furman*, for petitioner.
*James H. Harris, Jr.*, for respondent.

OPINION

WELLS, *Judge*: This case is before the Court on respondent's motion for summary judgment and petitioner's cross-motion for summary judgment pursuant to Rule 121.[1] We must decide whether respondent's settlement officer abused his discretion in denying petitioner's request to subordinate or withdraw a notice of Federal tax lien (NFTL), or in denying petitioner's request for an installment agreement.

*Background*

The record consists of the parties' pleadings; their respective cross-motions for summary judgment; various responses, declarations, and memoranda in support of or opposition to the motions; and the administrative record from the collection due process hearing.

Petitioner is a New Jersey corporation with its principal place of business in Mickleton, New Jersey. Petitioner's business relates to the homebuilding industry.

For the quarters ending September 30 and December 31, 2005, petitioner did not timely file its employer's quarterly tax returns. Petitioner timely filed its employer's quarterly tax returns for the quarters ending March 31, June 30, September 30, and December 31, 2006. Respondent assessed the tax shown on the return for each period, but petitioner did not fully pay its liabilities. Petitioner's unpaid employment tax liabilities total $1,100,622 for the quarters ending September 30 and December 31, 2005, and March 31, June 30, September 30, and December 31, 2006 (collectively, the periods in issue).

On or about November 6, 2007, respondent mailed petitioner a Final Notice—Notice of Intent to Levy and Notice of

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code of 1986 (Code), as amended, and Rule references are to the Tax Court Rules of Practice and Procedure.

Your Right to a Hearing (notice of intent to levy), informing petitioner that respondent intended to levy to collect petitioner's unpaid employment tax liabilities. Petitioner did not request a hearing or otherwise dispute the notice of intent to levy. Respondent subsequently filed an NFTL with respect to petitioner's unpaid quarterly employment tax liabilities for the periods in issue. [2]

Respondent notified petitioner on November 27, 2007, of the NFTL filing. On or about January 2, 2008, petitioner timely submitted Form 12153, Request for a Collection Due Process or Equivalent Hearing. Petitioner checked the boxes on Form 12153 requesting that an installment agreement be considered as a collection alternative and that the lien be withdrawn. In the attached explanation, petitioner stated that the lien made it more difficult for petitioner to satisfy its tax liabilities by making it impossible to sell its accounts receivable to a factor.

On January 25, 2008, and before receiving any reply from respondent, petitioner submitted a written request to respondent asking that the NFTL be subordinated to a line of credit from Penn Business Credit, LLC (Penn Business Credit). Petitioner also asked that respondent agree to a proposed installment agreement attached to the letter. In a footnote to petitioner's request, petitioner explained that there had been a misunderstanding about the nature of the financing relationship with Penn Business Credit when it filed the Form 12153 and that petitioner's counsel had not yet obtained the loan documents at that time. After examining the documents, petitioner's counsel ascertained that the financial relationship with Penn Business Credit was lending, not factoring, and that petitioner should be eligible to have the NFTL subordinated to the line of credit from Penn Business Credit. [3] Therefore, in its January 25, 2008, letter,

---

[2] The parties do not agree on the date when respondent filed the NFTL, which we find below is Nov. 26, 2007. See *infra* note 5.

[3] Factoring would have entailed the discounted sale of petitioner's accounts receivable to Penn Business Credit. In a factoring transaction, the financing company purchases the accounts receivable without recourse and acts as the principal in the debt collection process. See Downes & Goodman, Dictionary of Finance & Investment Terms (7th ed. 2006). Because factoring involves selling the accounts receivable rather than lending collateralized by the accounts receivable, the financing company is not a creditor and therefore possesses no lien of its own to which the tax lien may be subordinated. Accordingly, when petitioner believed that the relationship was factoring, it requested that the lien be withdrawn; but once it realized that the relationship was lending involving Penn Business Credit as a creditor, petitioner changed its request to ask that the lien be subordinated.

petitioner replaced its request in its Form 12153 that respondent withdraw the NFTL with a request that respondent subordinate the NFTL to Penn Business Credit's security interest.

In the January 25, 2008, letter, petitioner explained that it had fallen behind on its employment tax payments during the periods in issue, through the end of 2006, because of slowing demand in the market for new home construction and because many of petitioner's major customers had become unable to timely pay their invoices or had entirely defaulted on their obligations. Petitioner also explained that the situation left it in a "cash crisis" without available funds to both pay its employment taxes and have the cash necessary to operate its business.

During January 2007, as part of its effort to address the cash crisis, petitioner had entered into a financing agreement with Penn Business Credit (financing agreement). Under the terms of the financing agreement, Penn Business Credit extended credit to petitioner equal to the lesser of 50 percent of its qualifying accounts receivable[4] or $1 million. On February 2, 2007, Penn Business Credit filed with the State of New Jersey a financing statement to record its security interest under the financing agreement. The financing statement covered, among other things, "accounts", "accounts receivable", and "all other rights to the payment of money whether or not yet earned, for services rendered or goods sold, consigned, leased, or furnished" by petitioner.

In its January 25, 2008, request, petitioner stated that the financing agreement with Penn Business Credit had enabled petitioner to begin paying its employment taxes even though its own customers continued to lag behind in their payments. Without the financing from Penn Business Credit, petitioner predicted that it would be unlikely to have sufficient cashflow to satisfy the terms of its proposed installment agreement. To support its contention, petitioner attached two cashflow projections prepared by its accountant.

Petitioner also informed respondent in its January 25, 2008, letter that Penn Business Credit had refused to make any loans to petitioner since learning of the NFTL. However,

---

[4] The financing agreement defines which accounts receivable qualify as part of the borrowing base. Considerations include the solvency of the debtors, the finality of the sale, the terms of the account, and other factors that might affect the collectibility of the account.

petitioner asserted that Penn Business Credit would resume making loans to petitioner under its financing agreement if respondent would subordinate his lien to Penn Business Credit's security interest. Petitioner attached documentation from Penn Business Credit affirming that the lender would, indeed, resume making loans to petitioner if respondent subordinated the NFTL. In a footnote at the end of the letter, petitioner's counsel wrote:

As a protective measure, *because the need for subordination at this time is critical*, the undersigned intends to send on the behalf of * * * [petitioner] a letter to * * * [respondent's] District Director applying for a Certificate of Subordination of Federal Tax Lien. Such letter is intended to complement and not supersede this letter. [Emphasis added.]

For almost 4 months, respondent's office did not reply to petitioner's request. On May 12, 2008, respondent mailed to petitioner's counsel a letter informing him that the case had been forwarded to respondent's Philadelphia Office of Appeals. On May 20, 2008, respondent's Appeals Office confirmed its receipt of petitioner's request for a collection due process hearing and scheduled a telephone conference at 11 a.m. on June 17, 2008. On June 12, 2008, petitioner's counsel contacted respondent's settlement officer Darryl K. Lee (Mr. Lee) and requested a face-to-face conference hearing in respondent's Philadelphia Office of Appeals and a minimum 1-week extension to prepare documents requested by Mr. Lee.

Petitioner complied with Mr. Lee's document requests and also submitted a revised collection alternative with two cashflow projections, one with the accounts receivable financing from Penn Business Credit and one without. Petitioner explained that it had experienced a greater loss in revenue and higher fuel costs than anticipated and stated that it would be unable to satisfy the terms of its original proposed installment agreement.

Petitioner's counsel met with Mr. Lee in person on June 26, 2008. At the meeting, petitioner's counsel again requested that the lien be subordinated to Penn Business Credit's security interest. Mr. Lee told petitioner that the lien could not be subordinated because it did not have priority over Penn Business Credit's security interest since the NFTL had been filed later than the security agreement with

Penn Business Credit. Mr. Lee suggested that the lien might be withdrawn if petitioner would pay $300,000 immediately and enter into an installment agreement to pay off the balance of the liability within 10 years. At the time, Mr. Lee also warned that petitioner would have to stay current with its deposits for its Federal employment tax liabilities if it wanted to be eligible for an installment agreement.

Petitioner fully paid its employment taxes throughout 2007 and the first half of 2008 but began to fall behind on its deposits during the third quarter of 2008. By September 22, 2008, petitioner had not made any Federal tax deposits for its third quarter employment taxes, and Mr. Lee called petitioner's counsel to inform him that if these deposits were not made, petitioner would not be eligible to proceed with the installment agreement. Mr. Lee also stated his belief that petitioner's proposed installment agreement was unrealistic given the current state of petitioner's business and the housing market.

After conferring with petitioner, petitioner's counsel confirmed that petitioner had not made any deposits for employment taxes during the period ending September 30, 2008. In a letter to Mr. Lee dated September 26, 2008, petitioner's counsel explained that the housing crisis had dramatically worsened during the third quarter of 2008. However, petitioner contested Mr. Lee's assertion that it would be unable to meet its obligations under the installment agreement, explaining that it had recently taken steps to cut its costs and diversify its business. Since July 1, 2008, petitioner had laid off 45 employees, more than half of its workforce, and it had recently secured 10 contracts outside the homebuilding industry as well as a large housing contract. In the letter, petitioner again contended that it had been "severely hurt" by its inability to borrow against accounts receivable since the filing of the NFTL. Petitioner also stated that it "is certain that it will make the late deposits on or before September 30, 2008 and will keep current."

On September 29, 2008, upon receipt of petitioner's letter dated September 26, 2008, Mr. Lee called petitioner's counsel and told him that even if petitioner made its deposits by September 30, 2008, penalties would be assessed and he would not consider an installment agreement under those circumstances. On October 9, 2008, respondent issued peti-

tioner a Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330 (the notice of determination). The notice of determination explained that petitioner's request to have the lien withdrawn was being denied because respondent's Appeals Office had determined on the basis of the amount due and petitioner's compliance record that withdrawal would not facilitate collection. The Appeals Office rejected petitioner's proposed installment agreement because petitioner had not remained current with its Federal tax deposits for the quarter ending September 30, 2008. The notice of determination did not address petitioner's request to subordinate the NFTL.

## *Discussion*

Rule 121(a) allows a party to move "for a summary adjudication in the moving party's favor upon all or any part of the legal issues in controversy." Rule 121(b) directs that a decision on such a motion shall be rendered "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." The moving party bears the burden of demonstrating that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994). Facts are viewed in the light most favorable to the nonmoving party. *Id.*

Where the underlying tax liability is not in issue, we review the determination of the Appeals Office for abuse of discretion. See *Sego v. Commissioner*, 114 T.C. 604, 610 (2000). In reviewing for abuse of discretion, we review the reasoning underlying the settlement officer's determination to decide whether it was arbitrary, capricious, or without sound basis in fact or law. See *Murphy v. Commissioner*, 125 T.C. 301, 308 (2005), affd. 469 F.3d 27 (1st Cir. 2006). Petitioner does not dispute the underlying liabilities. Consequently, we review the determination of the Appeals Office for abuse of discretion.

I. *Whether Respondent's Appeals Office Abused Its Discretion by Denying Petitioner's Request To Subordinate or Withdraw the NFTL*

Petitioner contends that the Appeals Office abused its discretion when it refused to consider the subordination of the NFTL to Penn Business Credit's security interest.

Section 6325(d)(2) allows the Commissioner to issue a certificate of subordination to a Federal tax lien if:

the Secretary believes that the amount realizable by the United States from the property to which the certificate relates, or from any other property subject to the lien, will ultimately be increased by reason of the issuance of such certificate and that the ultimate collection of the tax liability will be facilitated by such subordination * * *

Internal Revenue Service (IRS) guidelines instruct:

The Service must exercise good judgment in weighing the risks and deciding whether to subordinate the federal tax lien. The Service's judgment is similar to the decision that an ordinarily prudent business person would make in deciding whether to subordinate his/her rights in a debtor's property in order to secure additional long run benefits. [5 Collecting Process, Internal Revenue Manual (IRM), pt. 5.17.2.8.6(4) (Dec. 14, 2007).]

In a collection due process hearing in which the taxpayer has requested that the Federal tax lien be subordinated, it is the task of the IRS Appeals Office to determine whether subordination will ultimately facilitate collection of the tax liability.

Mr. Lee did not reach the question of whether subordinating the Federal tax lien would facilitate collection because he determined that the Federal tax lien was already junior to the security interest held by Penn Business Credit. In determining the order of priority, Mr. Lee simply compared the dates on which the financing statements had been filed. Because Penn Business Credit's financing statement had been filed on February 2, 2007, and the NFTL had not been filed until November 26, 2007,[5] Mr. Lee determined that Penn Business Credit already had a priority interest in petitioner's accounts receivable and that it was not possible to subordinate the NFTL. Petitioner contends that Mr. Lee's

---

[5] The NFTL shows that it was prepared and signed on Nov. 15, 2007, and petitioner contends that it was filed on that date; but respondent denies that was the date it was filed. However, respondent does not offer an alternative date for the filing. New Jersey State records provided by petitioner and included in the administrative record show that the NFTL was filed on Nov. 26, 2007, and we therefore find Nov. 26, 2007, as the date of filing of the NFTL.

determination was an error of law[6] and that the Federal tax lien does have priority over Penn Business Credit's security interest in after-acquired accounts receivable.

In a priority dispute involving a Federal tax lien, the Supreme Court has held that questions of whether a property interest exists and the nature of that interest are State law issues, but Federal law governs the question of priority between conflicting interests. *Aquilino v. United States*, 363 U.S. 509, 513–514 (1960). Before the Federal Tax Lien Act of 1966, Pub. L. 89–719, 80 Stat. 1125, the Code did not contain any rules for resolving priority contests between Federal tax liens and liens arising under State law. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 720 n.6 (1979). Therefore, before 1966 the Supreme Court determined the relative priority of a rival lien as against a Federal tax lien by applying the common law principle of "'first in time is first in right'". *Bremen Bank & Trust Co. v. United States*, 131 F.3d 1259, 1263 (8th Cir. 1997) (quoting *State Bank of Fraser v. United States*, 861 F.2d 954, 963 (6th Cir. 1988)); see, e.g., *United States v. City of New Britain*, 347 U.S. 81, 85 (1954). A competing lien was considered in existence for "first in time" purposes only when it had been perfected; that is, when "the identity of the lienor, the property subject to the lien, and the amount of the lien are established." *United States v. City of New Britain*, *supra* at 84. The latter rule is known as the "choateness" doctrine. *United States v. Kimbell Foods, Inc.*, *supra* at 721 n.8.

The "first in time" and choateness tests were modified by the Federal Tax Lien Act of 1966, which "recognized the priority of many state claims over federal tax liens." *United States v. Kimbell Foods, Inc.*, *supra* at 738. Congress enacted the Federal Tax Lien Act of 1966 to "'[improve] the status of private secured creditors' and prevent impairment of commercial financing by '[modernizing] . . . the relationship of Federal tax liens to the interests of other creditors.'" *Id.* (quoting S. Rept. 1708, 89th Cong., 2d Sess. 1–2 (1966) (alterations in original)).

Among other changes, the legislation modified the priority rule for commercial transaction financing agreements by

---

[6] An error of law by the Appeals Office may be an abuse of discretion. See *Swanson v. Commissioner*, 121 T.C. 111, 119 (2003).

adding a 45-day safe-harbor period, codified at section 6323(c). [7] *Bremen Bank & Trust Co. v. United States*, *supra* at 1263. Under the "first in time" and choateness tests, a creditor would have priority over the Federal tax lien only if its interest was filed first and was choate at the time the NFTL was filed. *United States v. Equitable Life Assurance Socy.*, 384 U.S. 323, 327–328 (1966). In relevant part, section 6323(c) modifies the result under the first in time and choateness tests by providing that a Federal tax lien will not have priority against a "security interest" in "qualified property" arising from a loan made to a taxpayer within 45 days after the NFTL filing and before the lender acquires actual knowledge of the NFTL. The "qualified property" must be covered by a written agreement constituting a "commercial transactions financing agreement" that was entered into before the NFTL filing date. Under the statute, "qualified property" is limited to "commercial financing security" acquired by the taxpayer within 45 days of the NFTL filing,

---

[7] The following is the full text of the relevant portion of sec. 6323:

SEC. 6323(c). PROTECTION FOR CERTAIN COMMERCIAL TRANSACTIONS FINANCING AGREEMENTS, ETC.

(1) IN GENERAL.—To the extent provided in this subsection, even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing but which—

(A) is in qualified property covered by the terms of a written agreement entered into before tax lien filing and constituting—

(i) a commercial transactions financing agreement,

(ii) a real property construction or improvement financing agreement, or

(iii) an obligatory disbursement agreement, and

(B) is protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation.

(2) COMMERCIAL TRANSACTIONS FINANCING AGREEMENT.—For purposes of this subsection—

(A) DEFINITION.—The term "commercial transactions financing agreement" means an agreement (entered into by a person in the course of his trade or business)—

(i) to make loans to the taxpayer to be secured by commercial financing security acquired by the taxpayer in the ordinary course of his trade or business, or

(ii) to purchase commercial financing security (other than inventory) acquired by the taxpayer in the ordinary course of his trade or business;

but such an agreement shall be treated as coming within the term only to the extent that such loan or purchase is made before the 46th day after the date of tax lien filing or (if earlier) before the lender or purchaser had actual notice or knowledge of such tax lien filing.

(B) LIMITATION ON QUALIFIED PROPERTY.—The term "qualified property", when used with respect to a commercial transactions financing agreement, includes only commercial financing security acquired by the taxpayer before the 46th day after the date of tax lien filing.

(C) COMMERCIAL FINANCING SECURITY DEFINED.—The term "commercial financing security" means (i) paper of a kind ordinarily arising in commercial transactions, (ii) accounts receivable, (iii) mortgages on real property, and (iv) inventory.

(D) PURCHASER TREATED AS ACQUIRING SECURITY INTEREST.—A person who satisfies subparagraph (A) by reason of clause (ii) thereof shall be treated as having acquired a security interest in commercial financing security.

and "commercial financing security" includes accounts receivable. Sec. 6323(c)(2)(B), (C)(ii). The regulations define an "account receivable" as "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper." Sec. 301.6323(c)–1(c)(2)(ii), Proced. & Admin. Regs.

A "security interest" is defined by section 6323(h)(1), which provides:

SECURITY INTEREST.—The term "security interest" means any interest in property acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss or liability. A security interest exists at any time (A) if, at such time, the property is in existence and the interest has become protected under local law against a subsequent judgment lien arising out of an unsecured obligation, and (B) to the extent that, at such time, the holder has parted with money or money's worth.

The regulations provide that, for purposes of the statute, an account receivable is "in existence" when and to the extent that "a right to payment is earned by performance." Sec. 301.6323(h)–1(a)(1), Proced. & Admin. Regs.

Courts construing section 6323(c) have repeatedly held that if an account receivable is acquired more than 45 days after the NFTL is filed, the lender's security interest in the account receivable will not have priority over the tax lien even though the agreement conferring the security interest antedates the NFTL filing. See, e.g., *Am. Inv. Fin. v. United States*, 476 F.3d 810 (10th Cir. 2006); *Shawnee State Bank v. United States*, 735 F.2d 308 (8th Cir. 1984); *Texas Oil & Gas Corp. v. United States*, 466 F.2d 1040 (5th Cir. 1972); *Penetryn Intl., Inc. v. United States*, 391 F. Supp. 729 (D.N.J. 1975); *Distrib. Prods., Inc. v. Albert Enourato & Co.*, 34 AFTR 2d 5690, 74–2 USTC par. 9697 (D.N.J. 1974); *Contl. Fin., Inc. v. Cambridge Lee Metal Co.*, 265 A.2d 536 (N.J. 1970).

The manner in which section 6323(c) assigns priority with regard to accounts receivable is illustrated by examples in the regulations:

*Example* (*1*). (i) On June 1, 1970, a tax is assessed against M, a tool manufacturer, with respect to his delinquent tax liability. On June 15, 1970, M enters into a written financing agreement with X, a bank. The agreement provides that, in consideration of such sums as X may advance to M, X is to have a security interest in all of M's presently owned and subsequently acquired commercial paper, accounts receivable, and inven-

tory (including inventory in the manufacturing stages and raw materials). On July 6, 1970, notice of the tax lien is filed in accordance with § 301.6323(f)–1. On August 3, 1970, without actual notice or knowledge of the tax lien filing, X advances $10,000 to M. On August 5, 1970, M acquires additional inventory through the purchase of raw materials. On August 20, 1970, M has accounts receivable, arising from the sale of tools, amounting to $5,000. Under local law, X's security interest arising by reason of the $10,000 advance on August 3, 1970, has priority, with respect to the raw materials and accounts receivable, over a judgment lien against M arising July 6, 1970 (the date of the tax lien filing) out of an unsecured obligation.

(ii) Because the $10,000 advance was made before the 46th day after the tax lien filing, and the accounts receivable in the amount of $5,000 and the raw materials were acquired by M before such 46th day, X's $10,000 security interest in the accounts receivable and the inventory has priority over the tax lien. The priority of X's security interest also extends to the proceeds, received on or after the 46th day after the tax lien filing, from the liquidation of the accounts receivable and inventory held by M on August 20, 1970, if X has a continuously perfected security interest in identifiable proceeds under local law. However, the priority of X's security interest will not extend to other property acquired with such proceeds.

*Example* (*2*). Assume the same facts as in example 1 except that on July 15, 1970, X has actual knowledge of the tax lien filing. Because an agreement does not qualify as a commercial transactions financing agreement when a disbursement is made after tax lien filing with actual knowledge of the filing, X's security interest will not have priority over the tax lien with respect to the $10,000 advance made on August 3, 1970.

[Sec. 301.6323(c)–1(f), Proced. & Admin. Regs.]

Petitioner and Penn Business Credit entered into the financing agreement in which Penn Business Credit agreed to make loans to petitioner that would be secured by petitioner's then-existing accounts receivable. The arrangement under the financing agreement was structured like a revolving line of credit, allowing petitioner to pay off the loan or a portion thereof and then take out further loans when needed. When Penn Business Credit learned of the NFTL filing, it refused to make any more loans unless and until the Federal tax lien had been subordinated to Penn Business Credit's security interest in petitioner's accounts receivable under the financing agreement.

The facts of the instant case are analogous to an example in the regulations:

E, a manufacturer of electronic equipment, obtains financing from F, a lending institution, pursuant to a security agreement, with respect to which a financing statement was duly filed under the Uniform Commercial

Code on June 1, 1970. On April 15, 1971, F gains actual notice or knowledge that notice of a Federal tax lien had been filed against E on March 31, 1971, and F refuses to make further advances unless its security interest is assured of priority over the Federal tax lien. Upon examination, the district director believes that ultimately the amount realizable from E's property will be increased and the collection of the tax liability will be facilitated if the work in process can be completed and the equipment sold. In this case, the district director may, *in his discretion*, subordinate the tax lien to F's security interest for the further advances required to complete the work. [Sec. 301.6325–1(d)(2)(ii), *Example* (*3*), Proced. & Admin. Regs.; emphasis added.]

However, in petitioner's case, even though Mr. Lee had the discretion, pursuant to the foregoing example, to subordinate the Government's tax lien if it would be in the Government's interest, Mr. Lee did not even consider subordination because he erroneously believed the NFTL did not have priority over petitioner's accounts receivable.

As a preliminary matter, we note that the property over which there is a disagreement about priority is accounts receivable and that Penn Business Credit's financing agreement gave it a security interest in the property. In analyzing a priority dispute under the "first in time" and choateness tests, the Court must first determine what property interest exists under State law and then determine priority under Federal law. *Aquilino v. United States*, 363 U.S. at 512–514. Under New Jersey law, an "account" is defined as a right to payment for, among other things, "property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, * * * [or] for services rendered or to be rendered" that is not "evidenced by chattel paper or an instrument". N.J. Stat. Ann. sec. 12A:9–102(a)(2) (West 2004). Penn Business Credit's financing statement covers, among other things, accounts, accounts receivable, and other rights to payments for services rendered. Neither party contests that the rights covered by the financing statement are accounts receivable under both New Jersey law and section 301.6323(c)–1(c)(2)(ii), Proced. & Admin. Regs.

We proceed to the question of priority in petitioner's accounts receivable, which is governed by Federal law. See *Aquilino v. United States*, *supra* at 512–514. It may be assumed that the accounts receivable on petitioner's books before the filing of the NFTL were choate because the amounts were fixed and ascertainable at that time. If so,

Penn Business Credit had a priority interest in that property. See *United States v. Equitable Life Assurance Socy.*, 384 U.S. at 327–328; *Shawnee State Bank v. United States*, 735 F.2d at 310–311. However, accounts receivable petitioner had not yet acquired at the time the NFTL was filed were inchoate. See *Shawnee State Bank v. United States*, *supra* at 310–311; *Texas Oil & Gas Corp. v. United States*, 466 F.2d at 1051. To the extent that accounts receivable were acquired more than 45 days after the NFTL was filed or after Penn Business Credit had actual knowledge of the NFTL, whichever was earlier, the Government's tax lien had priority in such property. See *Shawnee State Bank v. United States*, *supra* at 310–311; *Texas Oil & Gas Corp. v. United States*, *supra* at 1051–1052.

Although the Commissioner's Appeals Office has discretion under section 6325(d) to determine whether it is in the Government's interest to subordinate a Federal tax lien, it appears that Mr. Lee's refusal to consider petitioner's request to subordinate the lien was based on an error of law. To the extent it was based upon an error of law, his determination constitutes an abuse of discretion. See *Swanson v. Commissioner*, 121 T.C. 111, 119 (2003). Accordingly, we hold that it was an abuse of discretion for respondent's settlement officer to fail to consider petitioner's request to subordinate the Federal tax lien on the basis of an erroneous conclusion of law that the Federal tax lien did not have priority.

Petitioner contends that it requested only that respondent withdraw the NFTL as an alternative in the event that respondent determined that it was impossible to subordinate the Federal tax lien. Because we hold that the Federal tax lien could have been subordinated and that respondent's settlement officer committed an error of law when he determined that the Federal tax lien could not have been subordinated, we need not consider the question of whether he abused his discretion by refusing to withdraw the NFTL.

## II. *Whether Respondent Abused His Discretion by Declining To Enter Into an Installment Agreement With Petitioner*

Respondent contends that because petitioner had fallen behind on its obligation to make timely deposits of its employment taxes, it was ineligible for an installment agree-

ment. Respondent urges us to hold that the issue of subordination of the tax lien is irrelevant because even if the tax lien had been subordinated, petitioner still would have been ineligible for a collection alternative because it was not in compliance with its employment tax deposits. In his briefs respondent did not even address the relevant law governing the priority of tax liens, nor did he bother to respond to petitioner's arguments that Mr. Lee erred in his interpretation of that law.

Instead, respondent rests his entire argument on a previous case in which we upheld the Commissioner's policy of rejecting collection alternatives when taxpayers have failed to pay their current taxes. See *Giamelli v. Commissioner*, 129 T.C. 107, 111 (2007). However, respondent's reliance on *Giamelli* is misplaced. In *Giamelli* and other previous cases in which we have upheld the Commissioner's rejection of collection alternatives because the taxpayers had failed to satisfy current tax obligations, the Commissioner had done nothing to contribute to the taxpayers' failures to remain current with their tax liabilities. In contrast, respondent's abuse of discretion contributed to petitioner's failure to make timely tax deposits.

After remaining current with its employment tax deposits for six quarters, petitioner failed to make timely deposits of its employment taxes during the third quarter of 2008. It was at that point that respondent issued his notice of determination rejecting petitioner's request for an installment agreement. Petitioner contends that it would have been able to remain current with its employment tax deposits if it had been able to borrow against its accounts receivable. However, because of the NFTL, Penn Business Credit had exercised its right under the security agreement to refuse to extend further loans to petitioner. Petitioner informed respondent of the importance of the accounts receivable financing in its January 25, 2008, letter, and it explained that its request to subordinate the NFTL was urgent. Nevertheless, respondent did not reply to petitioner for nearly 4 months.

When respondent's settlement officer, Mr. Lee, met with petitioner's counsel on June 26, 2008, Mr. Lee declined to even consider subordination of the NFTL because of his erroneous conclusion that the NFTL did not have priority over Penn Business Credit's security interest in petitioner's

accounts receivable. At that date, petitioner was still current on its employment tax deposits. Had petitioner been able to borrow against its accounts receivable in June or even earlier, it contends that it would have been able to timely make its deposits for the third quarter of 2008. Accordingly, it appears that petitioner's failure to make timely deposits of employment taxes for the third quarter of 2008 was not independent of Mr. Lee's erroneous determination that it was impossible to subordinate the NFTL, which we have held was an abuse of his discretion.

We do not accept respondent's argument that Mr. Lee's decision regarding subordination of the tax lien is irrelevant. Indeed, accepting respondent's contention would be tantamount to granting respondent the power to abuse his discretion at will as long as petitioner eventually misses a deposit on its employment taxes. In situations similar to the instant case, where petitioner's business is in a dire position largely due to industry conditions beyond its control, the Commissioner's decision not to subordinate an NFTL could exacerbate taxpayers' cashflow problems and make it difficult, if not impossible, for taxpayers to remain current with their tax deposits while continuing to run their businesses. The Commissioner could hold off issuing a notice of determination indefinitely until the taxpayer missed a deposit, and the Commissioner could then refuse to grant an installment agreement on the basis of the taxpayer's failure to remain current with its tax deposits. Because the taxpayer would have already fallen behind on current tax liabilities, we would be unable to meaningfully review the Commissioner's decision not to subordinate the NFTL. We find such a scenario unacceptable.

The Commissioner has discretion to enter into an installment agreement with a taxpayer if he determines "that such agreement will facilitate full or partial collection of such liability." Sec. 6159(a). The IRM advises: "When taxpayers are unable to pay a liability in full, an installment agreement (IA) *should* be considered." IRM pt. 5.14.1.2(4) (July 12, 2005) (emphasis added). The IRM also instructs: "Compliance with filing, paying estimated taxes, and federal tax deposits must be current from the date the installment agreement begins." *Id.* pt. 5.14.1.5.1(19).

Accordingly, the Commissioner must consider whether the installment agreement will facilitate collection of the liability, but he may not authorize an installment agreement until the taxpayer is current with its Federal tax deposits. However, nothing in the Code, the regulations, the IRM, or our decisions requires that the Commissioner deny the taxpayer's request for an installment agreement simply because it is not, at that moment, current with its Federal tax deposits. The Commissioner could, instead, wait until the taxpayer is current and then enter into the installment agreement. Even when an installment agreement is in place and the taxpayer fails to remain current with its tax liabilities, the Commissioner is not required to terminate the agreement; rather, he has the discretion to do so. Sec. 301.6159–1(c)(2), Proced. & Admin. Regs.

Mr. Lee would not even consider petitioner's efforts to become current on its deposits for the third quarter of 2008. After receiving a letter from petitioner's counsel promising that petitioner would make the late deposits by the end of the third quarter, Mr. Lee telephoned petitioner's counsel and effectively told him that it was too late and that petitioner should not bother because Mr. Lee's decision was already made.

Accordingly, we hold that it was an abuse of discretion for respondent's settlement officer to refuse to enter into an installment agreement on the basis of petitioner's failure to stay current with its tax deposits where respondent's abuse of discretion in refusing to consider subordination of the NFTL contributed to petitioner's falling behind on its tax deposits and where petitioner was not given the opportunity to become current.

Consequently, we will deny respondent's motion for summary judgment, grant petitioner's motion for summary judgment, and remand this case to respondent's Appeals Office for reconsideration of petitioner's request to subordinate the NFTL and enter into an installment agreement. [8]

_____

[8] Some of Mr. Lee's notes in his case activity log suggest that Mr. Lee's belief that petitioner's proposed installment agreement was unrealistic may have been a factor in his denial of the installment agreement. On remand, we also direct the Appeals Office to consider Internal Revenue Manual (IRM) pt. 5.14.1.4(8) (June 1, 2010), which does not contemplate rejecting an installment agreement simply because the Commissioner believes that the installment agreement is unrealistic given the taxpayer's financial condition. Insofar as Mr. Lee's determination to reject the installment agreement was based in any part on his assessment that petitioner could not

In reaching these holdings, we have considered all the parties' arguments, and, to the extent not addressed herein, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

*An appropriate order will be issued.*

---

afford to meet its obligations under the installment agreement, such reasoning does not appear to be in accord with the IRM. See *Lites v. Commissioner*, T.C. Memo. 2005–206.