T.C. Memo. 2015-15

UNITED STATES TAX COURT

ESTATE OF MARTHA E. SANFILIPPO, DECEASED, WILLIAM J. SNYDER, EXECUTOR, Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18344-12L.                     Filed January 22, 2015.

David W. Mitchell, for petitioner.

Janice B. Geier, for respondent.

MEMORANDUM OPINION

THORNTON, <u>Chief Judge</u>: This case arises from a petition for review of respondent's determination to proceed with a proposed levy. <u>See</u> sec. 6330(d).[1]

_____

[1]All section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[*2]**                              Background

The parties submitted this case fully stipulated pursuant to Rule 122. The

stipulated facts are found accordingly. Martha E. Sanfilippo (decedent) resided in

California when she died testate on July 14, 2004. The probate proceeding for

decedent's estate was held in California. When the petition was filed the estate's

executor, William J. Snyder, resided in California.

## I. Decedent's Trusts and Garrett Rajkovich

Decedent held interests in and general powers of appointment over various

trusts, including the Martha E. Sanfilippo Survivor Trust (survivor trust), the

Philip S. Sanfilippo Qualified Terminable Interest Property Trust (QTIP trust), and

the Martha E. Sanfilippo California Residence Trust (residence trust).

## II. Decedent's Last Will and Testament

Decedent's last will and testament provided, pursuant to her general power

of appointment, that the survivor trust was to distribute to her adopted son, Garrett

Rajkovich (Mr. Rajkovich), free of trust, her 10% undivided interest in property

on Meridian Avenue (Hacienda shopping center property) and on Monterey Road

(Monterey property), both of which were in San Jose, California. Decedent's will

also provided that the residence trust was to distribute to Mr. Rajkovich, free of

**[*3]** trust, property bordering the Almaden Expressway in San Jose, California (Almaden Expressway property).

On the date of decedent's death Mr. Rajkovich owed the survivor trust or decedent $21,268,186. Decedent's will forgave any debts that Mr. Rajkovich owed the survivor trust or her.

## III. The Hacienda Shopping Center Property Transfer and Mortgage

On February 3, 2005, Mr. Snyder, as successor trustee of the survivor trust, transferred by grant deed the estate's 10% interest in the Hacienda shopping center property to Mr. Rajkovich. This transfer increased Mr. Rajkovich's interest in the property from 65.7% to 75.7%. On the same day Mr. Rajkovich, David Rajkovich, Randall Rajkovich, and Nikette Pujalet executed a deed of trust assigning their rights in the Hacienda shopping center property as security for a $9,750,000 loan from a lending company.[2]

## IV. The Estate's Return

On March 31, 2005, the estate filed Form 4768, Application for Extension of Time To File a Return and/or Pay U.S. Estate (and Generation-Skipping Transfer) Taxes, requesting both an extension of time to file a Form 706, United

---

[2]The record does not show the relationship, if any, between the borrowers and does not indicate the interests in the Hacienda shopping center property held by any of these parties other than Mr. Rajkovich.

**[*4]** States Estate (and Generation-Skipping Transfer) Tax Return, and an extension of time to pay the estate tax liability pursuant to section 6161. Respondent granted the estate's request to file a Form 706 by October 14, 2005, and granted an extension of time to pay the tax until April 14, 2006.

On April 5 and June 12, 2005, the estate made estate tax payments of $2,252,000 and $550,000, respectively.

On October 18, 2005, respondent received the estate's Form 706, reporting a gross estate of $62,210,409, deductions of $29,225,132, a taxable estate of $32,985,277, and estate tax liability of $14,719,020. The $62,210,409 gross estate included Mr. Rajkovich's $21,268,186 debt and $27,020,483 of assets from the QTIP trust. On Schedule G of the Form 706 the estate also reported the following assets:

| Asset | Value |
|---|---|
| Undivided 50% interest in Monterey property | $882,500 |
| Undivided 10% interest in Hacienda shopping center property (after discount for lack of control and lack of marketability) | 1,778,000 |
| Almaden Expressway property | 1,700,000 |

**[\*5]** The balance due as shown on the Form 706 after credit for prior payments of $3,084,285 was $11,634,735.[3]

On or about November 23, 2005, respondent began examining the estate's return. On December 5, 2005, respondent assessed the $14,719,020 tax liability reported on the estate's return.

From March 29, 2006, to April 14, 2010, the estate submitted six additional Forms 4768, requesting extensions of time to pay the estate tax. These requests for extensions were based generally on the estate's ongoing attempts to liquidate certain assets and on representations that the remaining outstanding balance of estate tax was payable from the share of a single beneficiary, Mr. Rajkovich, who had liquidity problems of his own. Respondent granted the first six of these requests but on August 3, 2010, denied the last request for an extension of time.

In the meantime, on June 12, 2006, the estate had made an additional estate tax payment of $750,000. On October 1, 2007, respondent abated $660,309 of the estate's tax liability.

---

[3]The $3,084,285 credit included the $2,802,000 of total payments made on April 5 and June 12, 2005, and also included a $282,285 credit for gift tax paid on October 14, 2002.

**[\*6]** V.  Three-Way Security Agreement

On June 12, 2008, the estate, Mr. Rajkovich, and respondent entered into a collateral three-way security agreement (security agreement).[4]  It provided that as security for the estate's prompt and complete payment of its estate tax, Mr. Rajkovich would provide the Internal Revenue Service (IRS) a continuing first priority security in and lien on his 12.5% interest in GMK Oakley Development, LLC, for as long as the estate had unpaid estate tax liabilities.[5]  The security agreement further provided that if at any time the value of the collateral decreased from its value on the effective date of the agreement, the IRS could request and Mr. Rajkovich would provide additional collateral.

VI.  The Appeals Office Hearing

On June 21, 2011, respondent sent the estate Letter 1058, Final Notice - Notice of Intent to Levy and Notice of Your Right to a Hearing, with respect to the estate's then-unpaid estate tax liability of $15,071,058.

---

[4]The copy of the security agreement in the administrative record bears the signatures of Mr. Snyder and Mr. Rajkovich but none on behalf of the IRS.  The case activity records indicate that because the original three-way security agreement was held in a safe at a different location and was not available to the Appeals officer, he relied upon a copy provided by Mr. Snyder.  Presumably, this is the copy found in the administrative record.

[5]GMK Oakley Development, LLC, held various real properties.  For convenience, we refer to these properties as the GMK Oakley properties.

**[*7]**  On July 14, 2011, the estate timely submitted to respondent Form 12153, Request for a Collection Due Process or Equivalent Hearing.  On the Form 12153 the estate indicated that it wished to submit an offer-in-compromise as a collection alternative to the levy.  The estate also indicated on the Form 12153 that it wanted "to arrive at a compromise of the tax due because the Martha Sanfilippo Estate/Sanfilippo Survivor's Trust does not have the cash or ability to pay the entire amount due."

On or about August 17, 2011, the estate's case was assigned to Settlement Officer Alan Pobre (SO Pobre).  On August 31, 2011, SO Pobre sent Mr. Snyder a letter scheduling a face-to-face conference for October 25, 2011, and indicating that the estate would need to submit certain documents and financial information within 14 days to allow SO Pobre to consider any proposed collection alternatives. The letter also requested the estate to provide a "specific proposal by which to resolve the estate tax" but did not request a Form 656, Offer In Compromise.

Mr. Snyder promptly sent SO Pobre a three-ring notebook of requested documents and financial information.  In his cover letter Mr. Snyder indicated that although the estate had an undivided 50% interest in the Monterey property there was a mortgage on the property of about $1,350,226 that was subject to default and that the estate had been unaware of this mortgage when it filed its Form 706.

[*8] Mr. Snyder's letter also indicated that the estate had received a $1,150,000 offer for the property in October 2010, from which circumstance he concluded that the market value of the property was less than the outstanding mortgage.

On September 20, 2011, SO Pobre received a telephone message from Mr. Snyder inquiring about the priority of the IRS' lien on the Monterey property and indicating that a foreclosure sale of the property would take place that morning. According to his case activity notes, SO Pobre was of the opinion that the mortgage had priority over the IRS lien, which would have to be reduced to judgment to be effective against the estate.

On October 19, 2011, SO Pobre made the following entries in his "Case Activity Records":

> Returned Executor W.Snider's [sic] call. In determining viability of collection alternatives, value of estate needs to be established. There are two realties--the Monterey property, which sold on foreclosure last week for less than balance owed on note, and * * * [the Almaden Expressway property], presently valued at $1 [million.] Cash - subject to administrative expenses of estate. Loan as previously disclosed, now in escrow, expected to close in Jan.

> The remaining asset is largest debt owed to estate by decedent's son Garret Rajkovic [sic]. Executor is not sure if he can get a full financial package from Garret Rajkovic [sic], who has the biggest debt to the estate, but he knows enough to fill in the blanks for our conference. * * * [Mr. Snyder] said he would try to bring G. Rajvovic [sic] to the conference, and I said he needs to be told that his

[*9] attendance is voluntary as to the service. (G. Rajkovic [sic] owes the Estate, not the Service).

On October 25, 2011, SO Pobre held a face-to-face conference with Mr. Snyder and Mr. Rajkovich. During this conference SO Pobre requested that Mr. Snyder provide to him by November 9, 2011: a list of the estate's assets from the time of its first request for an extension of time to file and to pay to the date of the conference; a list of any asset dispositions for that same period; an explanation as to why no tax payments were made from these assets; and a report of the fair market values of the estate's current assets. Also during the conference, Mr. Rajkovich informed SO Pobre that the California Department of Water Resources was interested in purchasing the GMK Oakley properties and that he would remit the funds from this sale for payment on the estate's tax liability. SO Pobre agreed to "hold * * * [the estate's] case in suspense until June 2012" to permit Mr. Rajkovich time to sell these properties and to submit the proceeds to the IRS. SO Pobre also requested that by November 9, 2011, the estate submit a plan to collect and dispose of its remaining properties as well as an update on the sale of the GMK Oakley properties.

In a letter to Mr. Snyder dated October 27, 2011, SO Pobre stated: "My plan to hold this case in suspense until June 2012 is based on the projected time

[*10] frame for the Oakley sale to come to fruition." Also on October 27, 2011, SO Pobre recorded in his case activity records that if the estate were to liquidate all its assets presently and force Mr. Rajkovich to liquidate, possible proceeds would be only about $5 million, but "if the Oakley/Water District purchases the Oakley property [from Mr. Rajkovich], potential proceeds may exceed three times more. In view of this, an offer now (remedy sought) would not represent RCP [reasonable collection potential]."

On November 3, 2011, after receiving documentation from the estate, SO Pobre determined that the estate had received no funds on the foreclosure sale of the Monterey property.

On November 8, 2011, Mr. Snyder sent SO Pobre a letter stating:

> I expect to be able to settle the estate tax balance by June 30, 2012 with approximately $5,000,000 from the following sources: cash $1,500,000, collection of notes $500,000, proceeds from the * * * [Almaden Expressway property] $1,000,000 and collection from Garret after the [GMK] Oakley property is sold $2,000,000.

Mr. Snyder also enclosed a November 7, 2011, letter he had received from Mr. Rajkovich stating:

> As you know I have been unable to repay the tax levied on the forgiven Sanfilippo notes. I have attached for your review my original March 1, 2006 Financial Statement as well as my most current Financial Statement dated October 24, 2011. I have tried to explain what happened to the assets in the right hand column. Also

**[*11]** please find a time line explaining what happened to the primary assets originally planned to be used as payments.  As you can see no assets were liquidated to remove cash from my estate.  Any and all proceeds from activities were either re-invested or used to pay on going expenses to keep the business solvent.

On the accompanying balance sheet dated March 1, 2006, Mr. Rajkovich showed total assets of $102,724,893, total liabilities of $50,573,852, and total equity of $52,151,041.  The balance sheet also showed a value of $27,405,000 for Mr. Rajkovich's 75.7% interest in the Hacienda shopping center property.  On another accompanying balance sheet dated October 24, 2011, Mr. Rajkovich showed total assets of $19,922,379, total liabilities of $19,976,796, and total equity of negative $54,417.

On November 14, 2011, Mr. Snyder contacted SO Pobre, requesting confirmation that SO Pobre had received the November 8, 2011, letter as well as enclosures "plus guidance on [the] best alternative action/resolution."

On January 26, 2012, Mr. Snyder called SO Pobre and told him that an appraisal was being conducted on the GMK Oakley properties and that it was his belief the property would have a fair market value of $2 to $3 million.  Also on January 26, 2012, SO Pobre indicated in his case activity records that the GMK Oakley properties' sale was expected to occur in May 2012.

[*12] On February 2, 2012, SO Pobre made the following entries in his "Case

Activity Records":

> Follow up on unresolved matters from * * * [Mr. Snyder's] letter
> 11/08/2011, focus on notes receivable - $500 k expected to be
> collected by March.
>
> In view of agreed determination date in June 2012 and likelihood I
> would not be the one to bring this case to an end, reviewed in detail
> sequence of actions in marshalling all remaining assets of estate, with
> end in view of resolving before expected late-May early-June sale of
> Garret Rajkovich's property to space preserve [California Department
> of Water Resources].
>
> POA wants to firm up final disposition - a discharge of Almaden
> [Expressway] property and CNC of account - but expressed wish to
> stay clear of OIC (indicated as alternative remedy on F12153)
> because obligor (to estate) Garret Rajkovich has already expressed a
> wish against inviting decision on his personal liability arising from
> * * * [security agreement] for prior 6161 extensions worked out with
> Advisory.  Confirmed agreement with CNC direction.

On February 6, 2012, SO Pobre recorded in his case activity records that,

taking into account Mr. Rajkovich's obligations, independent of the estate's, under

the security agreement, he had determined that placing the estate's collection

account in currently not collectible (CNC) status would be appropriate.

On March 13, 2012, Mr. Snyder contacted SO Pobre and informed him that

the California Department of Water Resources was not interested in purchasing

the GMK Oakley properties and that Mr. Rajkovich was going to list the

**[*13]** properties for sale. Mr. Snyder also requested that he, Mr. Rajkovich, and SO Pobre meet to formulate a "common plan" and to "answer more definitely" what would occur if the GMK Oakley, LLC, properties were not sold by June 2012. SO Pobre requested a copy of the GMK Oakley properties listing agreement as well as a preliminary appraisal for the Almaden Expressway property before deciding whether to schedule the meeting. Also on March 13, 2012, SO Pobre recorded in his case activity records that he did "not expect to be the SO to see disposition" of the estate's CDP case. He listed various "agreements to date" and noted the following as the "Direction agreed to":

> Upon receipt of value of remaining assets of estate (see inventory)
> and proceeds from sale of [GMK] Oakley property * * *, discharge of
> 18200 Almaden Expwy from 6324 special lien and place account
> CNC (as alternative to original unarticulated offer).

On March 21, 2012, SO Pobre informed Mr. Snyder that the estate would need to submit additional information including: appraisals for the GMK Oakley and Almaden Expressway properties, the listing agreement for the GMK Oakley properties, and certain accounting of costs incurred by Mr. Rajkovich and by Mr. Snyder in administering the estate. The parties agreed to reduce to writing many

**[*14]** of the things they discussed "in order for the winding down to continue as planned even after * * * [SO Pobre's] departure."[6]

Shortly thereafter, SO Pobre transferred out of the IRS Appeals Office. On or about April 12, 2012, the estate's case was transferred to Settlement Officer Alan Owyang (SO Owyang). Also on April 12, 2012, Mr. Snyder and SO Owyang spoke by telephone. In response to Mr. Snyder's statement that SO Pobre had offered to draft a settlement agreement before his departure, SO Owyang indicated that he was unaware of any settlement agreement and that "this was not going to happen."

On April 13, 2012, SO Owyang sent an email to his Appeals team manager, complaining that the subject matter of the case was complex because it related to matters of estate and gift taxation that he was "not versed in" and that his reading of SO Pobre's case activity records was not helpful to him. On the same day SO Owyang emailed former SO Pobre, recounting his conversation with Mr. Snyder and stating: "I can't figure out what settlement document he is referring to". The record does not show any immediate response to this inquiry from former SO Pobre.

---

[6]As far as the record reveals, this understanding was never reduced to writing.

[*15] On May 2, 2012, SO Owyang spoke with Mr. Snyder by telephone. SO Owyang said his primary concern was how the estate "once valued at $63 million, is now reduced to $5 million * * *. Where did the $58 million go?".[7] He requested an "outline" to help explain this matter.

On May 9, 2012, Mr. Snyder sent SO Owyang a letter, explaining that "[t]he issue has been and remains the illiquidity of Mr. Rajkovich". The letter explained to SO Owyang, consistent with Mr. Snyder's March 13, 2012, letter to SO Pobre, that Mr. Rajkovich's hoped-for sale of the GMK Oakley properties had not yet materialized and it was unclear what proceeds the ultimate disposition of the properties might yield. The letter stated that the GMK Oakley properties were listed for sale for $3 million but there had been no offers to date. Mr. Snyder reiterated, consistent with the proposal formerly submitted to SO Pobre, that the estate "would like the Service to consider accepting a settlement payment consisting of the cash in the [Survivor] trust plus the proceeds from * * * [Mr. Rajkovich's] interest in GMK Oakley, LLC, with the Service discharging the

---

[7]SO Owyang's question reveals an imperfect understanding of the estate tax return, which reported a gross estate of $62,210,409 and allowable deductions of over $29 million, which included, among other things, charitable contribution deductions for distributions the estate made to charities and educational institutions. Of the reported $33 million taxable estate, about $20 million was attributable to debts that Mr. Rajkovich owed the estate.

**[*16]** remaining balance due." Accompanying the letter was the outline that SO

Owyang had requested, which showed the following information:

| Asset | Fair market value of asset on July 14, 2004 | Fair market value of asset on March 31, 2012 | Explanation |
|---|---|---|---|
| Cash, securities, misc. receivables | $3,232,836 | $1,547,000 | Paid liabilities, estate tax, admin. expenses |
| 10% interest Hacienda Gardens | 2,007,130 | --- | Distributed; estate tax paid 6/12/06 |
| Vacant land [Monterey property] | 2,064,000 | --- | Discovered previously unknown secured loan, could not sell; lost in foreclosure |
| Residence, plus furnishings [Almaden Expressway property] | 1,721,325 | 650,000 | Deteriorated in value |
| Vehicles | 36,770 | --- | Distributed |
| Notes (forgiven) | 21,268,186 | --- | Forgiven |
| Notes (other) | 3,479,793 | 525,000 | Collected most of notes, will collect balance (secured) |
| Gift tax paid within 3 years | 2,561,386 | --- | |
| Sanfilippo QTIP assets | 27,020,483 | --- | Distributed; estate tax paid 4/6/05 |
| Total assets | 63,391,909 | 2,722,000 | |

[*17] On June 5, 2012, SO Owyang conducted a "title check" with respect to the Hacienda shopping center properties. From this research SO Owyang learned that on February 3, 2005, these properties had been transferred to Mr. Rajkovich, and on that same day, as he recorded in his case activity records, Mr. Rajkovich had taken out "a mortgage against all the parcels for $9,750,000 * * *. What was the reason for the extraction of the equity, and where is the $9.75 million?" SO Owyang noted that the Hacienda shopping center properties had been valued at $1,778,000 on the estate's Form 706 and made the following entry in his "Case Activity Records":

> I reviewed the taxpayer's correspondence of 05/09/2012, in which William Snyder, the executor, is requesting for a settlement and appears to be leaving a settlement amount to us. We will not settle. The asset equity of $9.75 million needs to be explained by the beneficiary who dissipated it and, if they choose, they can submit an offer; but they will need to provide current appraisals of all the real property listed in my history entry of 06/04/2012.

On June 5, 2012, SO Owyang emailed former SO Pobre, asking him whether he could "recollect your memory" about this matter and answer the question "What was the reason for the extraction of the equity and where is the $9.75 million?" According to a June 8, 2012, entry in SO Owyang's case activity records, former SO Pobre responded that he had no recollection of any discussions about a $9.75 million equity extraction. In another email to SO Owyang dated

[*18] June 19, 2012, however, upon reviewing a draft of SO Owyang's proposed Appeals case memorandum, which focused primarily on this matter, former SO Pobre stated that he "would not want to second-guess" the valuation of the estate's assets as determined by the previous IRS audit of the estate's tax return. He also observed that the IRS "could not have been unaware", when it previously granted the estate's requests for extensions, of the transfer of the estate's 10% interests in the Hacienda shopping center properties.

According to SO Owyang's case activity records, on June 8, 2012, he reviewed Mr. Rajkovich's 2006 and 2007 balance sheets, erroneously concluding that Mr. Rajkovich's 10% interest (and not a 75.7% interest) in the Hacienda shopping center property was valued at $27,405,000 and $27,500,000 for 2006 and 2007, respectively.[8]

VII. Notice of Determination

On June 20, 2012, respondent issued a Notice of Determination Concerning Collection Action Under Section 6330, sustaining the proposed levy on the ground that the estate "had failed to provide us with a collection alternative that will satisfy the estate tax liability." SO Owyang's Appeals case memorandum,

_____

[8]Mr. Rajkovich's 2007 balance sheet was submitted to the IRS when the estate requested an additional extension of time to pay its outstanding tax liability.

**[\*19]** attached to the notice of determination, focuses primarily on the estate's transfer to Mr. Rajkovich of the Hacienda shopping center interests and the use of these property interests, shortly thereafter, by Mr. Rajkovich and others as security for a $9,750,000 loan. The memorandum states: "It is unknown why the $9.7 million was extracted from the equity of the Hacienda Gardens Shopping Center." The memorandum cites Internal Revenue Manual pt. 5.15.1.15(3) (May 9, 2008), for the principle that "[p]roper valuation of the assets is necessary to determine the total collection potential of the taxpayer. The value should be based on the fair market value (FMV)." The memorandum goes on to state:

> Because it is with reasonable certainty that the estate was once more solvent prior to any distributions and had the ability to make payments, and because of what appears to be moderate fluctuations in valuation of estate assets, the Appeals Office is unable to confirm the estate's true value and, hence, financial verification becomes tenuous and so the request for any collection alternative is denied.
>
> William J. Snyder's request for a settlement, for some unknown amount at some unknown period in time in the future, is denied, in summary.
>
>     \*       \*       \*       \*       \*       \*       \*
>
> The proposed levy action is sustained by the Appeals Office to allow Compliance to collect the unpaid estate tax. The taxpayer's proposal of a settlement of some unknown amount at some unknown period in time is, essentially, no proposal at all; let alone any sort of collection alternative.

**[*20]**                                     Discussion

I.  Statutory Framework

Section 6331(a) provides that if any person liable to pay any tax neglects or refuses to pay such tax within 10 days after notice and demand for payment, then the Secretary is authorized to collect the tax by levy.  Section 6330(a) requires the Secretary to send written notice of the right to an administrative hearing--a so-called collection due process (CDP) hearing--before a levy is made.  Any CDP hearing is to be conducted by the Commissioner's Appeals Office.  The person requesting the hearing may raise any relevant issue relating to the unpaid tax or proposed levy, including challenges to the appropriateness of the collection action and offers of collection alternatives.  If dissatisfied with the Appeals Office's determination, the person may seek review in this Court.  Sec. 6330(d)(1).

II.  Standard of Review

The estate has not challenged its underlying estate tax liability; accordingly, we review for abuse of discretion respondent's determination to proceed with the proposed levy.  See Sego v. Commissioner, 114 T.C. 604, 610 (2000); see also Keller v. Commissioner, 568 F.3d 710, 716 (9th Cir. 2009), aff'g in part T.C. Memo. 2006-166.

[*21] III.  Analysis of Respondent's Determination

On its Form 12153, submitted July 14, 2011, the estate proposed an offer-in-compromise (OIC) as a collection alternative.  As a result of preliminary meetings with Mr. Rajkovich and SO Pobre, Mr. Snyder sent a letter on behalf of the estate on November 8, 2011.  The letter proposed compromising the estate's liability for a payment of approximately $5 million, to be made by June 30, 2012, partly with proceeds anticipated from Mr. Rajkovich's sale of the GMK Oakley properties to the California Department of Water Resources.  Because of the uncertainty surrounding what proceeds Mr. Rajkovich's sale of his interests in the GMK Oakley properties might be expected to yield (SO Pobre recorded in his case activity records his belief that the sale of these interests could possibly yield up to three times as much as reflected in the proposed OIC), SO Pobre determined that it would be appropriate to place the estate's account in CNC status.  Before this agreement was reduced to writing, however, SO Pobre was transferred from the Appeals Office and the estate's case was reassigned to SO Owyang, who complained to his manager that he was inadequate for the task.  This concern proved to be well founded.

Mr. Snyder promptly reiterated to SO Owyang the collection alternative that the estate had previously proposed to SO Pobre, which depended largely on Mr.

[*22] Rajkovich's sale of the GMK Oakley properties. SO Owyang gave it no meaningful consideration and showed little appreciation of the considerations that had influenced SO Pobre's handling of the case up until that time. Instead, SO Owyang became focused on the issue of whether $9.75 million of "asset equity" had been "dissipated" from the estate through decedent's bequest to Mr. Rajkovich of a 10% interest in the Hacienda shopping center property.

SO Owyang noted that the estate had valued its interest in the Hacienda shopping center property at only $1,778,000 on its estate tax return, even though Mr. Rajkovich and three other persons later used this interest as security to obtain a $9,750,000 loan, shortly after the estate had transferred this interest to Mr. Rajkovich. SO Owyang also noted that Mr. Rajkovich had reported on his 2006 and 2007 financial statements that his interest in the Hacienda shopping center property was valued at $27,450,000 and $27,500,000 for 2006 and 2007, respectively. The clear implication is that SO Owyang believed that the estate had undervalued the Hacienda shopping center property interest on its estate tax return and that the undervaluation led to dissipation of assets that should have been available to pay estate tax.

SO Owyang's illogical analysis is based on a clearly erroneous view of law and assessment of the facts. Most notably, SO Owyang's analysis overlooked that

**[*23]** the 10% interest Mr. Rajkovich received from the estate represented only a small fraction of his total interest in the Hacienda shopping center property. Mr. Rajkovich held a 65.7% majority interest in the property before the estate transferred the additional 10% interest to him. More fundamentally perhaps, respondent had already examined the estate's return, which included the Hacienda shopping center interests that SO Owyang apparently believed the estate had undervalued, and had found no fault with the valuation. As former SO Pobre circumspectly put it in an email sent to SO Owyang, commenting on SO Owyang's draft Appeals case memorandum the day before the notice of determination was issued, he "would not want to second-guess" the valuation of the estate's assets as determined by previous IRS audit of the estate's tax return. In any event, SO Owyang's focus on the estate's valuation of these interests was misplaced in a CDP proceeding in which the underlying liability was not at issue.

Respondent does not attempt in any meaningful fashion to defend SO Owyang's analysis in this regard but contends it constitutes harmless error. We disagree. Error is harmless when it causes no prejudice or does not affect the ultimate determination in the case. See Estate of Mangiardi v. Commissioner, T.C. Memo. 2011-24, aff'd, 442 Fed. Appx. 526 (11th Cir. 2011). It seems

[*24] apparent that SO Owyang's erroneous assumptions lay at the heart of his ultimate determination to sustain the levy.

Respondent also argues that SO Owyang did not abuse his discretion in sustaining the proposed levy because the estate failed to submit an OIC under section 7122. The record shows, however, that the estate had in fact, at SO Pobre's request, submitted an OIC as memorialized in Mr. Snyder's November 8, 2011, letter, and that this offer was rememorialized in Mr. Snyder's May 9, 2012, letter to SO Owyang.[9] The record also shows that when SO Pobre received the estate's proposal he did not question whether it was a proper OIC but instead determined that a more appropriate collection alternative would be to place the estate's account in CNC status, so as to maximize the Government's chances of a higher recovery, in the event Mr. Rajkovich's sale of his Hacienda shopping center interests yielded greater proceeds than contemplated in the estate's OIC.

SO Pobre had worked informally with the estate for several months in an attempt to determine an appropriate collection alternative. The estate had provided SO Pobre and SO Owyang substantially everything that was requested. SO Owyang never communicated to the estate that he required a more specific

---

[9]Neither SO Pobre nor SO Owyang requested a Form 656 from the estate, and there is no indication in the record that they ever raised any issue as to the adequacy of the estate's method of proposing an OIC.

[*25] offer than the one SO Pobre had considered. And in considering what might constitute a proper collection alternative, SO Owyang appeared to give no meaningful consideration to the effect of the three-way security agreement among the estate, Mr. Rajkovich, and the IRS--an agreement that, as far as the record reveals, still remains in place.

On brief respondent cites cases in which we have held that there is neither a requirement nor a reason that the Appeals officer must wait a certain amount of time before rendering his determination as to a proposed levy. See, e.g., Murphy v. Commissioner, 125 T.C. 301 (2005), aff'd, 469 F.3d 27 (1st Cir. 2006); Estate of Atkinson v. Commissioner, T.C. Memo. 2007-89; Manjourides v. Commissioner, T.C. Memo. 2005-242; Morlino v. Commissioner, T.C. Memo. 2005-203; Clawson v. Commissioner, T.C. Memo. 2004-106. Respondent's reliance on these cases is misplaced. As previously discussed, SO Owyang erred in his factual determinations, did not meaningfully consider the estate's May 9, 2012, proposal, and did not request the estate to submit a more definite proposal.

It is true, as respondent asserts, that an Appeals officer is under no duty to negotiate indefinitely and does not necessarily abuse his or her discretion by rejecting a collection alternative that is based on the possibility of the taxpayer's selling his or her properties at some unspecified time in the future. See Kuretski v.

[*26] Commissioner, T.C. Memo. 2012-262, at *11, aff'd, 755 F.3d 929 (D.C. Cir. 2014); Vela v. Commissioner, T.C. Memo. 2010-100.  But the Appeals officer is under a duty to provide a fair hearing.  SO Owyang's refusal to meaningfully consider any collection alternative because of incorrect and illogical factual and legal assumptions caused the estate to be denied a fair hearing.

We conclude and hold that SO Owyang abused his discretion in determining to sustain the proposed levy.  See Fargo v. Commissioner, 447 F.3d 706, 709 (9th Cir. 2006) (noting the Commissioner abuses his discretion when his decision is based on a "clearly erroneous assessment of the facts"), aff'g T.C. Memo. 2004-13; Antioco v. Commissioner, T.C. Memo. 2013-35, at *20-*22.  Consequently, we will remand this case for a supplemental Appeals Office hearing to consider the estate's proposed collection alternatives.  Upon remand, the Appeals Office shall consider any new collection alternative that the estate may wish to propose, taking into account any changed circumstances.  See Eichler v. Commissioner, 143 T.C. __, __ (slip op. at 17) (July 23, 2014); Alessio Azzari, Inc. v. Commissioner, 136 T.C. 178 (2011) (remanding collection case to Appeals Office upon finding abuse of discretion).

**[\*27]** To reflect the foregoing,

<u>An appropriate order will be issued</u>.