# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 26, 2013          Decided June 20, 2014

No. 13-1090

PETER KURETSKI AND KATHLEEN KURETSKI,
APPELLANTS

v.

COMMISSIONER OF INTERNAL REVENUE SERVICE,
APPELLEE

On Appeal from the Decision and
Order of the United States Tax Court

*Tuan N. Samahon* argued the cause for appellants. With him on the briefs were *Carlton M. Smith*, *Frank Agostino*, and *John P.L. Miscione*.

*Bethany B. Hauser*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief was *Teresa E. McLaughlin*, Attorney.

Before: SRINIVASAN, *Circuit Judge*, and EDWARDS and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by Circuit Judge SRINIVASAN.

SRINIVASAN, *Circuit Judge*:  Peter and Kathleen Kuretski owed more than $22,000 in federal income taxes for the 2007 tax year.  They paid none.  The Internal Revenue Service assessed the unpaid amount plus penalties and interest, and then attempted to collect from the Kuretskis by means of a levy on the couple's home.  The Kuretskis unsuccessfully challenged the proposed levy in the Tax Court.

The Kuretskis now contend that the Tax Court judge may have been biased in favor of the IRS in a manner that infringes the constitutional separation of powers.  They point to 26 U.S.C. § 7443(f), which enables the President to remove Tax Court judges on grounds of "inefficiency, neglect of duty, or malfeasance in office."  According to the Kuretskis, Tax Court judges exercise the judicial power of the United States under Article III of the Constitution, and it violates the constitutional separation of powers to subject any person clothed with Article III authority to "interbranch" removal at the hands of the President.  The Kuretskis thus ask us to strike down 26 U.S.C. § 7443(f), vacate the Tax Court's decision, and remand their case for re-decision by a Tax Court judge free from the threat of presidential removal and hence free from alleged bias in favor of the Executive Branch.

To our knowledge, this is the first case in any court of appeals to present the question of whether 26 U.S.C. § 7443(f) infringes the constitutional separation of powers.  We answer that question in the negative.  Even if the prospect of "interbanch" removal of a Tax Court judge would raise a constitutional concern in theory, there is no cause for concern in fact:  the Tax Court, in our view, exercises Executive authority as part of the Executive Branch.  Presidential removal of a Tax Court judge thus would constitute an intra—not inter—branch

removal. We also reject the Kuretskis' remaining challenges to the Tax Court's disposition of their case.

## I.

## A.

When the Internal Revenue Service determines that a taxpayer owes more to the federal government than the taxpayer has paid, the IRS may make an assessment recording the taxpayer's outstanding liability. *See* 26 U.S.C. § 6201; *United States v. Fior D'Italia, Inc.*, 536 U.S. 238, 243 (2002). An assessment is "essentially a bookkeeping notation" made when the IRS "establishes an account against the taxpayer on the tax rolls." *Laing v. United States*, 423 U.S. 161, 170 n.13 (1976). Upon issuance of an assessment, the federal government acquires a lien on all property belonging to the delinquent taxpayer. *See* 26 U.S.C. §§ 6321, 6322. "'A federal tax lien, however, is not self-executing,' and the IRS must take 'affirmative action to enforce collection of the unpaid taxes.'" *EC Term of Years Trust v. United States*, 550 U.S. 429, 430-31 (2007) (alteration and ellipsis omitted) (quoting *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 720 (1985)). One of the IRS's "principal tools" for collecting unpaid taxes is a "levy," a "legally sanctioned seizure and sale of property." *Id.* at 431 (internal quotation marks omitted).

Until 1921, taxpayers had no pre-assessment opportunity to dispute the amount they owed the Treasury. Nor could they challenge a levy before its imposition. A taxpayer's only recourse was to pay the disputed amount and then bring a refund suit against the tax collector or the United States. *See Flora v. United States*, 362 U.S. 145, 151-52 (1960); *Burns, Stix Friedman & Co. v. Comm'r*, 57 T.C. 392, 394 n.7 (1971).

The Revenue Act of 1921 for the first time required giving taxpayers pre-assessment notice of a deficiency. The 1921 Act also provided that "[o]pportunity for hearing shall be granted" before assessment of the tax. Revenue Act of 1921, ch. 136, § 250(d), 42 Stat. 227, 266. But it was not until 1924 that Congress created a tribunal separate from the Bureau of Internal Revenue (as the IRS was then known) to hear taxpayers' pre-assessment appeals. *See* Harold Dubroff, *The United States Tax Court: An Historical Analysis*, 40 Alb. L. Rev. 7, 64-66 (1975); *see also John Kelley Co. v. Comm'r*, 326 U.S. 521, 527-28 (1946).

The Revenue Act of 1924 established the "Board of Tax Appeals" as "an independent agency in the executive branch of the Government." Revenue Act of 1924, ch. 234, § 900(a), (k), 43 Stat. 253, 336, 338. The Act provided for the President to appoint members of the Board to ten-year terms with the advice and consent of the Senate. *Id.* § 900(b), 43 Stat. at 336-37. The Act also stated that "[a]ny member of the Board may be removed by the President for inefficiency, neglect of duty, or malfeasance in office, but for no other reason." *Id*. at 337. In 1926, Congress extended the term of Board members to twelve years and amended the removal provision to guarantee "notice and opportunity for a public hearing" before the President could remove a Board member for cause. Revenue Act of 1926, ch. 27, § 1000, 44 Stat. 9, 105-06. The 1926 Act also made the Board's decisions directly reviewable by the circuit courts of appeals. *Id.* § 1001(a), 44 Stat. at 109-10.

In 1942, Congress changed the name of the Board to "The Tax Court of the United States" and declared that the court's members "shall be known" as "judges." *See* Revenue Act of 1942, ch. 619, § 504(a), 56 Stat. 798, 957. But the 1942 Act otherwise left intact the provisions governing the former Board of Tax Appeals.

More than a quarter of a century later, Congress enacted a series of additional changes to the statutes governing the Tax Court. *See* Tax Reform Act of 1969, Pub. L. No. 91-172, §§ 951-962, 83 Stat. 487, 730-36. The 1969 Act amended the statute addressing the status of the court to read:

> There is hereby established, under article I of the Constitution of the United States, a court of record to be known as the United States Tax Court. The members of the Tax Court shall be the chief judge and the judges of the Tax Court.

*Id.* § 951, 83 Stat. at 730 (codified at 26 U.S.C. § 7441). The 1969 Act extended the term of Tax Court judges from twelve years to fifteen years. *See* Pub. L. No. 91-172, § 952, 83 Stat. at 730. Congress did not, however, alter the provision allowing for presidential removal of Tax Court judges. The removal statute remains in place today, and states:

> Judges of the Tax Court may be removed by the President, after notice and opportunity for public hearing, for inefficiency, neglect of duty, or malfeasance in office, but for no other cause.

26 U.S.C. § 7443(f). It appears that no President has ever sought to remove a member of the Tax Court or the Board of Tax Appeals. *See* Deborah A. Geier, *The Tax Court, Article III, and the Proposal Advanced by the Federal Courts Study Committee: A Study in Applied Constitutional Theory*, 76 Cornell L. Rev. 985, 994 n.54 (1991).

After the 1969 Act, the Tax Court continued to provide a pre-assessment forum for taxpayers to challenge the IRS's deficiency determinations. Upon making an assessment,

however, the IRS could levy on a delinquent taxpayer's property without any additional opportunity for a hearing. *See United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 720 (1985); *United States v. Rodgers*, 461 U.S. 677, 682-83 (1983). That changed in 1998, when Congress established the "collection due process" hearing procedure "to temper 'any harshness'" caused by the IRS's ability to levy on a taxpayer's property before the taxpayer could challenge the collection action. *Byers v. Comm'r*, 740 F.3d 668, 671 (D.C. Cir. 2014) (quoting *Olsen v. United States*, 414 F.3d 144, 150 (1st Cir. 2005)); Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, § 3401(b), 112 Stat. 685, 747-48 (codified as amended at 26 U.S.C. § 6330).

Under the 1998 Act, the IRS must give thirty days' notice before levying on any property to collect unpaid taxes. 26 U.S.C. § 6330(a). During those thirty days, the taxpayer may request a collection-due-process hearing before the IRS Office of Appeals, at which the taxpayer may raise "any relevant issue relating to the unpaid tax or the proposed levy." *Id.* § 6330(b)(1), (c)(2). If dissatisfied with the result of a collection-due-process hearing, the taxpayer may appeal to the Tax Court. *See id.* § 6330(d)(1). The Tax Court's decisions in collection-due-process cases are subject to review in this Court. *Byers*, 740 F.3d at 675-77.

B.

On April 15, 2008, Peter and Kathleen Kuretski of Staten Island, N.Y., filed a joint federal income tax return for 2007 on which they reported a tax liability of $24,991 and claimed a withholding credit of $2856. The Kuretskis did not include any payment of the liability reported on their return. Because the Kuretskis did not dispute the amount they owed, the IRS assessed the balance shown on the return along with penalties

and interest.  In October 2008, the IRS notified the Kuretskis that they owed $23,601.50 to the United States Treasury, and the IRS told the Kuretskis that it intended to levy on their property thirty days later unless they paid the amount due.

The Kuretskis, through their counsel, filed timely requests for a collection-due-process hearing on the ground that "a levy would create a burden and hardship" for the couple.  The Kuretskis submitted an "offer in compromise," proposing to pay $1000 in five monthly installments of $200 to settle their outstanding tax liabilities, and they also asked for an abatement of penalties.  *See* 26 C.F.R. § 301.7122-1 (procedure for compromises); *see also id.* § 301.6651-1(c) (procedure for abatement of penalties based on reasonable cause for failure to pay).

In a letter to the Kuretskis' attorney dated April 14, 2010, an IRS settlement officer rejected the Kuretskis' offer in compromise.  The letter explained that the Kuretskis' equity in their home rendered the offer "unacceptable as an alternative for collection."  The settlement officer later told the Kuretskis' attorney that the IRS might be willing to accept a full-payment installment agreement under which the Kuretskis would pay $250 a month for the next nine years.

On June 8, 2010, the Kuretskis' attorney advised the IRS that her clients continued to seek a partial-payment agreement instead of the full-payment installment plan.  On June 28, the Kuretskis and their attorney met with the settlement officer, but did not then (or later) accept the full-payment installment offer. On July 7, 2010, the settlement officer closed the Kuretskis' case file.  An IRS appeals team manager approved the settlement officer's decision the next day, and the IRS sent a notice of determination to the Kuretskis on July 20 informing them that their requests for a compromise and an abatement of

penalties had been rejected.  The Kuretskis appealed to the Tax Court.  *See* 26 U.S.C. § 6330(d)(1) (right to Tax Court review of IRS's collection-due-process determination).

C.

On September 12, 2011, the Kuretskis' case was tried before the Tax Court.  As is relevant here, the Kuretskis, represented by new counsel, argued that the IRS settlement officer abused her discretion by closing their case file and issuing a notice of determination even though the parties were on the verge of reaching agreement on an alternate schedule for installment payments.  The IRS settlement officer, however, testified that she had no recollection of any discussions on an alternate schedule, and that she had concluded by early July 2010 that she could no longer keep open the $250-a-month offer that had been on the table since April of that year.  The Tax Court found that the "weight of the evidence" supported the settlement officer's account.  Mem. Findings of Fact & Op. at 10.  According to the Tax Court, the settlement officer had maintained a "firm stance" on the $250 figure through several months of negotiations, and an IRS officer "is not obligated to negotiate indefinitely."  *Id.* at 11.

The Kuretskis also alleged that they should avoid any liability for late-payment penalties because they had reasonable cause for their failure to pay.  *See* 26 U.S.C. § 6651(a)(2).  The Tax Court rejected that argument.  The Tax Court noted that the Kuretskis bore the burden of proof on this issue and concluded that the Kuretskis had failed to carry their burden.  The Tax Court did find for the Kuretskis on one issue, overturning an assessed penalty of $972 for underpayment of estimated tax under 26 U.S.C. § 6654.

One month after the Tax Court's decision, the Kuretskis

filed a motion for reconsideration and a motion to vacate the decision. The Kuretskis argued for the first time that the statute allowing for presidential removal of Tax Court judges, 26 U.S.C. § 7443(f), violates Article III of the Constitution. The Kuretskis asked the Tax Court to find § 7443(f) unconstitutional, and then to decide the case again "free of 'the improper threat of interbranch removal.'" Order at 1-2 (Mar. 4, 2013) (quoting Kuretskis' argument).

On March 4, 2013, the Tax Court denied both motions. The court declined to address the Kuretskis' Article III argument, concluding that they had failed to explain why they waited to raise the argument until after the court's initial decision. The Kuretskis appealed to this Court, and the parties stipulated that the D.C. Circuit is the proper venue for review. *See* 26 U.S.C. § 7482(b)(2) (Tax Court decisions may be reviewed by any federal court of appeals designated by the IRS and the taxpayer "by stipulation in writing").

## II.

The Kuretskis challenge the Tax Court's decision on both constitutional and nonconstitutional grounds. As to the latter, the Kuretskis argue that the Tax Court committed clear error in finding them liable for late-payment penalties under 26 U.S.C. § 6651(a)(2). We first take up that challenge before addressing the constitutional claims.

Under § 6651(a)(2), taxpayers who fail to pay their income taxes on time are liable for an additional 0.5% of the amount due for each additional month of nonpayment, up to a maximum of 25%. A taxpayer may gain relief from liability for late payment by showing "that such failure is due to reasonable cause and not due to willful neglect." 26 U.S.C. § 6651(a)(2). The taxpayer "must make an affirmative showing of all facts alleged as a

reasonable cause for his failure to . . . pay such tax on time *in the form of a written statement containing a declaration that it is made under penalties of perjury*." 26 C.F.R. § 301.6651-1(c)(1) (emphasis added). The written statement "should be filed with the district director or the director of the service center with whom the [taxpayer's] return is required to be filed." *Id.*

The Kuretskis contend that they "clearly had reasonable cause" for their failure to pay their taxes on time, thus entitling them to penalty relief under § 6651(a)(2). Pet'rs' Br. 49. The Kuretskis, however, have never submitted a written statement under penalty of perjury explaining why they had reasonable cause for their nonpayment. They raise no challenge to the validity of the regulation requiring a written statement under penalty of perjury as a prerequisite for penalty abatement. *Cf. Mayo Found. for Med. Educ. & Research v. United States*, 131 S. Ct. 704, 712-16 (2011) (*Chevron* deference to IRS regulations). The regulation was adopted after notice and comment, *see* 36 Fed. Reg. 13,594, 13,596 (July 22, 1971), and the Kuretskis do not dispute its applicability to the penalty abatement issue in their case. *See* Pet'rs' Br. 50-51 (citing 26 C.F.R. § 301.6651-1(c)(1)). We see no basis for excusing their failure to comply with a regulation they concede to be applicable. *See, e.g.*, *Desabato v. United States*, 538 F. Supp. 2d 422, 426 n.6 (D. Mass. 2008) ("Failure to submit such a written statement to the IRS precludes a plaintiff from making a 'reasonable cause' showing for the first time in federal court."); *Brown v. United States*, 43 Fed. Cl. 463, 467 (1999) (taxpayer liable for late-payment penalty where he failed to submit the written statement required under 26 C.F.R. § 301.6651-1(c)(1)). We therefore find no error in the Tax Court's holding that the Kuretskis owe late-payment penalties under 26 U.S.C. § 6651(a)(2). And because the Kuretskis' failure to comply with the regulation affords a sufficient basis for upholding the imposition of late-payment penalties under § 6651(a)(2), we

need not consider the Kuretskis' remaining arguments concerning the application of that provision against them.

## III.

The Kuretskis' principal contention on appeal is that the prospect of presidential removal of Tax Court judges under 26 U.S.C. § 7443(f) violates the constitutional separation of powers. The IRS, for its part, initially advances three reasons for declining to reach the merits of the Kuretskis' separation-of-powers argument. We first consider (and reject) those asserted reasons before turning to the merits.

## A.

The IRS's first asserted basis for declining to reach the Kuretskis' separation-of-powers argument is that they forfeited the claim by failing to raise it until their motion for reconsideration. The general rule in Tax Court cases is "not to consider an argument raised for the first time in a motion for reconsideration." *Cerand & Co. v. Comm'r*, 254 F.3d 258, 260 (D.C. Cir. 2001). But the Supreme Court has recognized an exception to the general rule: an appellate court may exercise its discretion to hear "a constitutional challenge that is neither frivolous nor disingenuous" if the "alleged defect . . . goes to the validity of the Tax Court proceeding that is the basis for th[e] litigation." *Freytag v. Comm'r*, 501 U.S. 868, 879 (1991). In that situation, the "disruption to sound appellate process entailed by entertaining objections not raised below" may be outweighed by "'the strong interest of the federal judiciary in maintaining the constitutional plan of separation of powers.'" *Id.* (quoting *Glidden Co. v. Zdanok*, 370 U.S. 530, 536 (1962) (plurality opinion)).

Just as the Supreme Court in *Freytag* elected to consider a belated constitutional challenge to the validity of a Tax Court proceeding, *id.*, we do so here. In *Freytag*, as here, the petitioners raised a nonfrivolous constitutional challenge to the validity of a Tax Court proceeding after the Tax Court's initial decision, and the petitioners' claim implicated the federal judiciary's strong interest in maintaining the separation of powers. The IRS, apparently attempting to suggest that the Kuretskis' separation-of-powers claim is "frivolous," characterizes the Kuretskis' argument as "of a type that has been repeatedly rejected." Resp't Br. 40 (citing *Nash Miami Motors, Inc. v. Comm'r*, 358 F.2d 636 (5th Cir. 1966); *Burns, Stix Friedman & Co.*, 57 T.C. 392; and *Parker v. Comm'r*, 724 F.2d 469 (5th Cir. 1984)). None of the decisions on which the IRS relies, however, considered the removal power argument raised by the Kuretskis. Nor does this case involve "sandbagging" concerns of the sort that the Supreme Court noted in *Stern v. Marshall*, 131 S. Ct. 2594, 2608 (2011), in declining to consider an argument that the bankruptcy court lacked statutory authority to resolve the respondent's defamation claim. In *Stern*, a timely objection to the bankruptcy court's statutory authority could have led to the consideration of the claim in federal district court. *See* 28 U.S.C. § 157(b)(5). Here, by contrast, in light of the Tax Court's exclusive jurisdiction over collection due process appeals, there is no other forum in which the Kuretskis' appeal could have been considered. *See* 26 U.S.C. § 6330(d)(1).

Second, the IRS argues that the Kuretskis waived any pre-payment challenge to the constitutionality of the Tax Court proceedings by seeking relief in the Tax Court in the first place. Although Article III confers on litigants a "personal right" to "have claims decided before judges who are free from potential domination by other branches of government," that right is "subject to waiver, just as are other personal constitutional rights that dictate the procedures by which civil and criminal matters

must be tried." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848-49 (1986) (internal quotation marks omitted). But aside from any "personal right" that they assert, the Kuretskis' arguments also implicate a separate interest protected by Article III: "'the role of the independent judiciary within the constitutional scheme of tripartite government.'" *Id.* at 848 (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 583 (1985)). And when such a "structural principle is implicated in a given case, . . . notions of consent and waiver cannot be dispositive because the limitations serve institutional interests that the parties cannot be expected to protect." *Id.* at 850-51. In *Schor*, the Supreme Court thus found that the respondent's decision to seek relief in the CFTC rather than in federal court amounted to a waiver of his claim under Article III of a "personal right" to "an impartial and independent federal adjudication," 473 U.S. at 848, but that he did not (and could not) thereby waive his "structural" claim, *id.* at 850-51.

The IRS errs in resting its waiver argument on *McElrath v. United States*, 102 U.S. 426 (1880). In *McElrath*, a retired Marine Corps officer sued the government in the Court of Claims for back pay, and the government asserted a counterclaim on the ground that the officer had received more than he was entitled to be paid. *Id.* at 435-36, 440-41. After the Court of Claims rendered judgment in favor of the government on its counterclaim, the officer argued in the Supreme Court that the entry of judgment without a jury trial violated the Seventh Amendment. *Id.* at 439-40. The Supreme Court affirmed, observing that "if [a litigant] avails himself of the privilege of suing the government in the special court organized for that purpose . . . , he must do so subject to the conditions annexed by the government to the exercise of the privilege." *Id.* at 440. As the Court later explained in *Schor*, however, the "right to trial by jury in civil cases"—at issue in *McElrath*—is one of the "personal constitutional rights" that is "subject to waiver."

14

*Schor*, 478 U.S. at 848-49. Because the Kuretskis raise a structural claim in addition to any "personal" claim akin to the one asserted in *McElrath*, they did not waive their structural challenge to the Tax Court proceedings by seeking relief in that court. *See, e.g.*, *Waldman v. Stone*, 698 F.3d 910, 918 (6th Cir. 2012).

Finally, the IRS asserts that the Kuretskis lack Article III standing to challenge the presidential removal of Tax Court judges. To establish Article III standing, the Kuretskis must show (i) that they have suffered an "injury in fact," (ii) that the injury is "fairly traceable to the challenged action" of the IRS, and (iii) that it is "likely . . . that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (alteration, ellipsis, and internal quotation marks omitted). The proposed levy on the Kuretskis' home undoubtedly qualifies as an "injury in fact" that is fairly traceable to the IRS, but the IRS argues that the Kuretskis fail to meet the redressability requirement. This Court, however, could grant the Kuretskis adequate redress by striking down 26 U.S.C. § 7443(f) and then remanding the case to the Tax Court for a new trial before a judge no longer subject to the threat of presidential removal. We granted comparable relief in *Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 684 F.3d 1332, 1340 (D.C. Cir. 2012). After holding that a statutory provision limiting the ability of the Librarian of Congress to remove judges from the Copyright Royalty Board was unconstitutional, we remanded the case to the Board so that the appellants' claims could be heard by a constitutionally valid tribunal. *Id.* at 1340-42. Although *Intercollegiate Broadcasting System* involved a challenge to a statute *restricting* removal while this case involves a challenge to a statute *allowing* for removal, we see no reason why that distinction could make a difference for redressability purposes. We thus conclude that

the Kuretskis have standing to bring their separation-of-powers claim, and we proceed to consider the merits of the issue.

## B.

In support of their argument that presidential removal of Tax Court judges violates the constitutional separation of powers, the Kuretskis' "primary position" is that the Tax Court exercises "judicial power" under Article III of the Constitution. In the alternative, the Kuretskis contend that the Tax Court is part of the Legislative Branch. Either way, the Kuretskis argue, presidential removal of Tax Court judges "leaves those judges in an unconstitutional bind" because they "must fear removal from an actor in another branch." Pet'rs' Br. 11, 33.

The Kuretskis' challenge rests on the assumption that "interbranch removal" is unconstitutional under *Bowsher v. Synar*, 478 U.S. 714 (1986). "Nothing in *Bowsher*, however, suggests that one Branch may never exercise removal power, however limited, over members of another Branch." *Mistretta v. United States*, 488 U.S. 361, 411 n.35 (1989). We need not explore the precise circumstances in which interbranch removal may present a separation-of-powers concern because this case does not involve the prospect of presidential removal of officers in another branch. Rather, the Kuretskis have failed to persuade us that Tax Court judges exercise their authority as part of any branch other than the Executive. Consequently, if a President were someday to exercise the authority under 26 U.S.C. § 7443(f) to remove a Tax Court judge for cause, the removal would be entirely consistent with separation-of-powers principles.

16

1.

The Kuretskis' principal submission is that Tax Court judges exercise the judicial power of the United States under Article III of the Constitution. We disagree.

Article III prescribes that the "judicial Power of the United States" is "vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. Judges of those courts "hold their Offices during good Behaviour," *id.*, which means that they are removable only via impeachment and conviction. *See United States ex rel. Toth v. Quarles*, 350 U.S. 11, 16 (1955). That arrangement aims "to give judges maximum freedom from possible coercion or influence by the executive or legislative branches of the Government." *Id.*

"Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III." *Stern*, 131 S. Ct. at 2609. As a result, "[w]hen a suit is made of 'the stuff of the traditional actions at common law tried by the courts at Westminster in 1789,' and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts." *Id.* (citation omitted) (quoting *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90 (1982) (Rehnquist, J., concurring in the judgment)).

At the same time, the Supreme Court has recognized a "category of cases involving 'public rights'" that Congress can constitutionally assign to non-Article III tribunals. *Id.* at 2610 (quoting *Northern Pipeline*, 458 U.S. at 67 (plurality opinion)). The "public rights" category comprises disputes that "'could be

conclusively determined by the Executive and Legislative Branches'" without judicial intervention. *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 589 (1985) (quoting *Northern Pipeline*, 458 U.S. at 68). The "public rights doctrine reflects simply a pragmatic understanding that, when Congress selects a quasi-judicial method of resolving matters" that could be decided with no judicial review, "the danger of encroaching on the judicial powers is reduced." *Id.*

Although the precise contours of the "public rights" doctrine are not fully formed, *see Stern*, 131 S. Ct. at 2610; *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 51 n.8 (1989), it is "settled" that the category of public rights includes matters of "internal revenue" and "taxation," at least at the pre-collection stage. *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 450-51 & nn.8-9 (1977) (internal quotation marks omitted); *see Crowell v. Benson*, 285 U.S. 22, 50-51 (1932); *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856). Congress therefore can constitutionally assign the adjudication of pre-collection tax disputes to non-Article III tribunals. *See Samuels, Kramer & Co. v. Comm'r*, 930 F.2d 975, 992 (2d Cir. 1991) ("The relationship between the government and taxpayer plainly gives rise to public rights and we have no doubt that the resolution of such disputes can be relegated to a non-Article III forum."), *abrogated on other grounds by Freytag*, 501 U.S. at 892.

Congress undisputedly exercised that option when it initially established the Tax Court as an Executive Branch agency rather than an Article III tribunal. *See* Revenue Act of 1924 § 900(k), 43 Stat. at 338 (Board of Tax Appeals established as independent executive agency); Revenue Act of 1942 § 504(a), 56 Stat. at 957 (Board renamed "The Tax Court of the United States," but status as independent executive agency unchanged); *see also* 26 U.S.C. § 1100 (1946). The

Kuretskis believe that Congress shifted course in the 1969 Tax Reform Act, when it adjusted the Tax Court's formal title from "Tax Court of the United States" to "United States Tax Court," and provided that the Tax Court was "established[] under article I of the Constitution." 26 U.S.C. § 7441. There is no indication, however, that by prescribing that the Tax Court had been established under Article *I*, Congress somehow converted what had been an Executive Branch tribunal into an Article *III* court. The legislative history in fact indicates a belief and intention that the Tax Court is not an Article III body. *See* S. Rep. No. 91-552, at 304 n.2 (1969) ("limitations of Article III of the Constitution, relating to life tenure and maintenance of compensation," do not apply to Tax Court judges). It would seem clear, then, that the Tax Court is not a part of the Article III Judicial Branch, and that its judges do not exercise the "judicial Power of the United States" under Article III.

The Supreme Court's decision in *Freytag v. Commissioner*, however, adds a wrinkle to what would otherwise be a straightforward analysis. The dispute in *Freytag* concerned a statute allowing the Chief Judge of the Tax Court to appoint "special trial judges" and assign certain cases to them. *See* 26 U.S.C. § 7443A. The petitioners in *Freytag* contended that the provision for appointment of special trial judges violates the Appointments Clause of Article II. That clause grants Congress the power to "vest the Appointment of . . . inferior Officers . . . in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. The *Freytag* petitioners argued that "a special trial judge is an 'inferior Officer'" and that "the Chief Judge of the Tax Court does not fall within any of the Constitution's three repositories of the appointment power." *Freytag*, 501 U.S. at 878 (alteration omitted). The Supreme Court rejected that argument. Four Justices would have held that the Tax Court is an executive "Department" and the Chief Judge is its head. *See id.* at 920-22

(Scalia, J., concurring in part and concurring in the judgment). A majority of five Justices instead held that the Tax Court is a "Court of Law" (and, implicitly, that the Chief Judge of the Tax Court can exercise the appointment power on behalf of the court). *See id.* at 870, 892.

The Kuretskis rely substantially on the *Freytag* majority's holding that the Tax Court is a "Court of Law." That holding, however, does not call into question the constitutionality of the President's removal power over Tax Court judges under 26 U.S.C. § 7443(f). A tribunal may be considered a "Court of Law" for purposes of the Appointments Clause notwithstanding that its officers may be removed by the President. The *Freytag* Court's treatment of territorial courts confirms the point. The Court indicated that territorial courts constitute "Courts of Law" for purposes of the Appointments Clause, *see Freytag*, 501 U.S. at 892, even though it was by then well settled that the President may remove judges from territorial courts (including without cause) if the governing statute allows it. *See Shurtleff v. United States*, 189 U.S. 311, 316 (1903) ("judges of the territorial courts may be removed by the President"); *see also McAllister v. United States*, 141 U.S. 174, 179-91 (1891) (rejecting constitutional challenge to President Cleveland's suspension of Alaska territorial judge).

To be sure, the *Freytag* Court observed that the Tax Court "exercises a portion of the judicial power of the United States." *Freytag*, 501 U.S. at 891. That statement, if considered in isolation, could be construed to suggest that Tax Court judges exercise Article III powers. But the *Freytag* Court clarified that "non-Article III tribunals . . . exercise the judicial power of the United States," such that "the judicial power of the United States is not limited to the judicial power defined under Article III." *Id.* at 889 (citing *Am. Ins. Co. v. Canter*, 26 U.S. (1 Pet.) 511, 546 (1828)). The Court therefore used the phrase "judicial

power" in "an enlarged sense," not in the particular sense employed by Article III. *See Murray's Lessee*, 59 U.S. at 280 ("judicial act" in "an enlarged sense" encompasses "all those administrative duties the performance of which involves an inquiry into the existence of facts and the application to them of rules of law"); *cf. City of Arlington v. FCC*, 133 S. Ct. 1863, 1877-78 (2013) (Roberts, C.J., dissenting) (administrative agencies exercise "judicial power" when they "adjudicat[e] enforcement actions and impos[e] sanctions on those found to have violated their rules"). As another court of appeals has explained, a "central lesson from *Freytag* is that adjudication by adversarial proceedings can exist outside the context of Article III." *S.C. State Ports Auth. v. Fed. Mar. Comm'n*, 243 F.3d 165, 171 (4th Cir. 2001), *aff'd*, 535 U.S. 743 (2002); *see Freytag*, 501 U.S. at 891 (Tax Court is "an adjudicative body"). The *Freytag* Court, after all, repeatedly compared the Tax Court to the non-Article III territorial courts. *See id.* at 889-90, 892.

The Kuretskis argue that the precedents allowing for presidential removal of territorial judges have little bearing on their separation-of-powers argument because "territorial courts do not exercise the judicial power of the United States." Pet'rs' Br. 40-41. It is true that territorial courts do not exercise "the judicial power of the United States" in the particular sense addressed by Article III. *See McAllister*, 141 U.S. at 190. But the *Freytag* Court suggests that territorial courts exercise "judicial power" in the same overarching sense in which the Tax Court exercises "judicial power," such that the territorial courts and the Tax Court are similarly situated for purposes of the Appointments Clause. *See Freytag*, 501 U.S. at 889-90 (territorial court is "one of the 'Courts of Law'" under Appointments Clause). We see no reason why the territorial courts and the Tax Court are not also similarly situated for purposes of presidential removal. Accordingly, we conclude that the Tax Court's status as a "Court of Law"—and its

exercise of "judicial power"—for Appointments Clause purposes under *Freytag* casts no doubt on the constitutionality of the President's authority to remove Tax Court judges.

2.

Even if the Tax Court does not exercise Article III judicial power, the Kuretskis argue as a fallback position that the Tax Court functions as part of the Article I Legislative Branch. Understandably, the Kuretskis make no attempt to explain how the Tax Court could conceivably be considered a legislative body or conceivably be seen to possess legislative power. Instead, the Kuretskis suggest that the Tax Court may fall within the Legislative Branch because it constitutes "an Article I legislative court." We have no disagreement with the characterization of the Tax Court as an "Article I legislative court." Congress, as explained, amended 26 U.S.C. § 7441 in 1969 to provide that the Tax Court is a "court of record" established "under article I of the Constitution." And the *Freytag* Court understood that the "clear intent of Congress" in the 1969 Act was "to transform the Tax Court into an Article I legislative court." *Freytag*, 501 U.S. at 888. But even if the 1969 Act transformed the Tax Court into an Article I legislative court, it did not thereby transfer the Tax Court to the Legislative Branch.

The Constitution itself "nowhere makes reference to 'legislative courts'"; the "concept of a legislative court" instead "derives from the opinion of Chief Justice Marshall in *American Insurance Co.* v. *Canter*." *Glidden*, 370 U.S. at 543-44 (citing *Canter*, 26 U.S. (1 Pet.) 511). In *Canter*, Chief Justice Marshall used the phrase "legislative Courts" to describe the territorial courts of Florida, which at the time had yet to be admitted to the Union as a state. "The jurisdiction with which [the Florida territorial courts] are invested," according to Chief Justice

Marshall, "is not a part of that judicial power which is defined in the 3d article of the Constitution, but is conferred by Congress, in the execution of those general powers which that body possesses over the territories of the United States." *Canter*, 26 U.S. (1 Pet.) at 546; *cf.* U.S. Const. art. IV, § 3, cl. 2 ("Congress shall have Power to . . . make all needful Rules and Regulations respecting the Territory . . . belonging to the United States"). Later decisions describe tribunals such as the Court of Customs Appeals and the superior courts of the District of Columbia as "legislative courts"; those bodies, like the Florida territorial courts, were created by Congress pursuant to non-Article III powers. *See Ex parte Bakelite Corp.*, 279 U.S. 438, 449-61 (1929); *cf.* U.S. Const art. I, § 8, cl. 1 ("Power To lay and collect . . . Duties, Imposts and Excises"); *id.* art. I, § 8, cl. 17 (legislative power "over such District . . . as may . . . become the Seat of the Government of the United States").

A tribunal constitutes a "legislative court" if its power "is not conferred by the third article of the Constitution, but by Congress in the execution of other provisions of that instrument." *Williams v. United States*, 289 U.S. 553, 565-66 (1933). Congress's authority to create the Tax Court stems from two clauses in Article I, Section 8 of the Constitution: the Taxing and Spending Clause and the Necessary and Proper Clause. *See* U.S. Const. art. I, § 8, cl. 1 ("Congress shall have Power To lay and collect Taxes . . . to pay the Debts and provide for the common Defence and general Welfare"); *id.* art. I, § 8, cl. 18 (authority "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers"). The Tax Court itself has explained that it owes its existence to Congress's authority under those Clauses. *See Burns, Stix Friedman & Co.*, 57 T.C. at 394-95.

The Tax Court's status as an "Article I legislative court," *Freytag*, 501 U.S. at 888, does not mean that its judges exercise

"legislative power" under Article I. *Cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472-73 (2001) ("legislative power" consists of decisionmaking authority without any "'intelligible principle to which the person or body authorized . . . is directed to conform'" (quoting *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928))).  The Tax Court is in the business of interpreting and applying the internal revenue laws, *see Freytag*, 501 U.S. at 891, not in the business of making those laws.  And the Tax Court's Article I origins do not distinguish it from the mine run of Executive Branch agencies whose officers may be removed by the President.  After all, every Executive Branch entity, from the Postal Service to the Patent Office, is established pursuant to Article I.  *See* U.S. Const. art. I, § 8, cl. 7 (Postal Clause); *id.* art. I, § 8, cl. 8 (Copyright and Patent Clause).  The Tax Court no more exercises Article I powers than do those agencies.  The Tax Court's status as an "article I legislative court" therefore presents no barrier to presidential removal of Tax Court judges. *See Mistretta*, 488 U.S. at 411 n.35 ("the President may remove a judge who serves on an Article I court").

3.

We have explained that Tax Court judges do not exercise the "judicial power of the United States" pursuant to Article III. We have also explained that Congress's establishment of the Tax Court as an Article I legislative court did not transfer the Tax Court to the Legislative Branch.  It follows that the Tax Court exercises its authority as part of the Executive Branch.

That conclusion is fully consistent with *Freytag*.  The *Freytag* majority rejected the argument that the Tax Court is an executive "Department" for purposes of the Appointments Clause.  *See Freytag*, 501 U.S. at 888.  But the majority also made clear that an entity can be a part of the Executive Branch

without being an executive "Department." *See id.* at 885 ("We cannot accept the Commissioner's assumption that every part of the Executive Branch is a department, the head of which is eligible to receive the appointment power."); *id.* at 886 ("a holding that every organ in the Executive Branch is a department would multiply indefinitely the number of actors eligible to appoint"). One of our sister circuits thus understands *Freytag* to hold that "the Tax Court is a Court of Law *despite being part of the Executive Branch.*" *S.C. State Ports Auth.*, 243 F.3d at 171 (emphasis added).

The *Freytag* majority also observed that the Tax Court "remains independent of the Executive . . . Branch[]," and in that sense exercises something other than "executive" power. 501 U.S. at 891. We understand that statement to describe the Tax Court's functional independence rather than to speak to its constitutional status. The Supreme Court has used similar language to describe "quasilegislative" and "quasijudicial" agencies such as the Federal Trade Commission, noting that such agencies are "wholly disconnected from the executive department" and that their members must "act in discharge of their duties independently of executive control." *Humphrey's Ex'r v. United States*, 295 U.S. 602, 629-30 (1935). While "independent," members of such agencies can be removed by the President for cause. *See Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 773 (2002) (Breyer, J., dissenting on other grounds) (noting that "[c]onstitutionally speaking, an 'independent' agency belongs neither to the Legislative Branch nor to the Judicial Branch of Government," and "even 'independent' agencies[] are more appropriately considered to be part of the Executive Branch"). And the Tax Court is hardly the sole Executive-Branch "adjudicative body," *Freytag*, 501 U.S. at 891, to sit in "independent" judgment of other executive actors. *See, e.g.*, 5 U.S.C. § 1204(a) (Merit Systems Protection Board sits in judgment of other agencies); *id.* § 7105(g) (Federal

Labor Relations Authority); 10 U.S.C. § 867 (Court of Appeals for the Armed Forces reviews decisions of other Defense Department entities); 29 U.S.C. § 659(c) (Occupational Safety and Health Review Commission sits in judgment of Secretary of Labor); 39 C.F.R. § 3001.1 *et seq.* (Postal Regulatory Commission sits in judgment of Postal Service). Congress may afford the officers of those entities a measure of independence from other executive actors, but they remain Executive-Branch officers subject to presidential removal. *Cf. City of Arlington*, 133 S. Ct. at 1873 n.4 ("Agencies . . . conduct adjudications . . . and have done so since the beginning of the Republic. These activities take . . . 'judicial' form[], but they are exercises of—indeed, under our constitutional structure they *must* be exercises of—the 'executive Power.'" (quoting U.S. Const. art. II, § 1, cl. 1)).

In relevant respects, the constitutional status of the Tax Court mirrors that of the Court of Appeals for the Armed Forces. The statutes establishing the status of the two courts precisely parallel one another. Each provides that the respective court is a "court of record" "established under article I of the Constitution." 10 U.S.C. § 941 (Court of Appeals for the Armed Forces); 26 U.S.C. § 7441 (Tax Court). In fact, when Congress in 1969 enacted that language for the Tax Court, it specifically sought to bring the Tax Court into alignment with the Court of Appeals for the Armed Forces (then known as the Court of Military Appeals). *See* S. Rep. No. 91-552, at 304 ("The bill establishes the Tax Court as a court under Article I of the Constitution," and "[a]t the present time, the Court of Military Appeals is the only other Article I court."). In doing so, and in departing from the prior language describing the Tax Court as an executive "agency," Congress aimed to emphasize the Tax Court's independence as a "court" reviewing the actions of the IRS. *See id.* at 302 (observing that "it is anomalous to continue to classify [the Tax Court] with quasi-judicial executive

agencies that have rulemaking and investigatory functions" as opposed to a body having "only judicial duties," and noting "questions in the minds of some as to whether it is appropriate for one executive agency to be sitting in judgment on the determinations of another executive agency"). And while we have no need to reach the issue here, Congress, in establishing those entities as a "court" rather than an "agency," perhaps also exempted them from statutes that apply solely to executive "agencies." *Cf. Megibow v. Clerk of the U.S. Tax Court*, No. 04-3321, 2004 U.S. Dist. LEXIS 17698, at *13-22 (S.D.N.Y. Aug. 31, 2004) (Tax Court is a "court of the United States" and not an "agency" under the Administrative Procedure Act, 5 U.S.C. § 551(1)), *aff'd*, 432 F.3d 387 (2d Cir. 2005) (per curiam).

Congress did not, however, move the Tax Court outside the Executive Branch altogether. Indeed, the Supreme Court has recognized that the Court of Appeals for the Armed Forces is an "Executive Branch entity" and that its judges are "Executive officers." *Edmond v. United States*, 520 U.S. 651, 664-65 (1997); *see id.* at 664 n.2 (finding it "clear that [the Court of Appeals for the Armed Forces] is within the Executive Branch"). Congress sought to—and did—achieve the same status for the Tax Court.

IV.

The Kuretskis raise a separate constitutional challenge to the IRS's procedure for collection-due-process hearings. That procedure, in the Kuretskis' view, failed in their case to satisfy the requirements of the Fifth Amendment's Due Process Clause. We are unpersuaded.

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'"

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). The Kuretskis acknowledge that they received notice of the IRS's proposed levy and a hearing before the IRS settlement officer assigned to their case. The Kuretskis, however, have a "sneaking suspicion" that the decision to deny them a penalty abatement was "influenced" by the appeals team manager who supervised the settlement officer. Pet'rs' Br. 54. They argue that they should have been afforded an opportunity to comment on the settlement officer's written report to her appeals team manager or "some opportunity to interact" with the manager before he made a final decision to deny their abatement request. *Id.* at 56.

Assuming arguendo that the Due Process Clause generally requires the IRS to afford a taxpayer some manner of hearing before imposing a levy, *see United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 60-61 (1993), there is no basis for recognizing a constitutional entitlement for taxpayers to comment on an IRS settlement officer's report to her appeals team manager or present their case directly to the appeals team manager. The Kuretskis rely on *Ballard v. Commissioner*, 544 U.S. 40 (2005), which holds that the Tax Court must disclose the reports of special trial judges who serve as factfinders in cases in which Tax Court judges make the ultimate decision. But the Court based its holding on its interpretation of the Tax Court Rules, *see id.* at 46-47 & n.2, and "express[ed] no opinion" on whether "the Due Process Clause requires disclosure of a trial judge's factfindings that have operative weight in a court's final decision," *id.* at 64-65.

In *Gottlieb v. Pena*, 41 F.3d 730 (D.C. Cir. 1994), we rejected a due process claim similar to the one advanced by the Kuretskis. There, a Coast Guard lieutenant commander applied to a Coast Guard board for correction of his military record, and

the board heard evidence before submitting a recommended decision to the Secretary of Transportation. The Secretary was the final decisionmaker, however, and the plaintiff had no opportunity to examine the board's initial decision or make a submission to the Secretary in light of the board's recommendation. We held that the Coast Guard's procedures did not violate the Fifth Amendment Due Process Clause, concluding that the lieutenant commander had no "entitle[ment] to input or process past the first 'tier' and cannot force the agency to open its essentially deliberative process." *Id.* at 737 (citing *Morgan v. United States*, 298 U.S. 468, 481 (1936)); *see also Morgan*, 298 U.S. at 481 ("[e]vidence may be taken by an examiner" and "may be sifted and analyzed by competent subordinates," so long as "the officer who makes the determinations . . . consider[s] and appraise[s] the evidence which justifies them").

In any event, regardless of the procedure in the collection-due-process hearing, the Kuretskis subsequently had an opportunity to challenge the IRS's proposed levy in Tax Court, and also to contest any underlying liability for which they lacked a prior opportunity to raise a challenge. *See* 26 U.S.C. § 6330(c)(2), (d)(1). When a petitioner appeals the IRS's proposed levy action to the Tax Court, the levy action is suspended while the appeal remains pending. *Id.* § 6330(e)(1). Thus, the Tax Court proceeding *itself* allows an opportunity for a pre-deprivation hearing. Because the Kuretskis make no claim that the Tax Court proceedings fall short of the Fifth Amendment Due Process Clause's requirements, they cannot prevail on their challenge under that Clause.

* * * * *

For the foregoing reasons, we affirm the decision of the Tax Court.

*So ordered.*