TATEL, Circuit Judge,
concurring:
Although I agree that al Bahlul’s conviction runs afoul of Article III of the Consti *23 tution, I write separately to explain why, having joined the en banc Court in upholding that conviction, I now join an opinion that invalidates it. I also wish to draw out a few points that are especially relevant to the separation-of-powers questions this case presents.
Sitting en banc, this Court decided last year that the Ex Post Facto Clause does not prevent Congress from granting military commissions jurisdiction over the crime of conspiracy. We began by noting that in the months leading up to the September 11th attacks, when al Bahlul committed his crimes, federal law gave military commissions jurisdiction over “offenders or offenses that by statute or by the law of war may be tried by military commissions.” 10 U.S.C. § 821 (emphasis added). Because no statute on the books in 2001 allowed military commissions to try conspiracy, the en banc Court needed to determine whether that crime qualified as a “law of war” offense at that time and was thus triable by military commission. If so, the Court observed, al Bahlul’s ex post facto argument would necessarily fail. Reviewing much of the same history and case law before us now, the en banc Court was unable to conclude that “conspiracy was not already triable by law-of-war military commissions” in 2001. Al Bahlul v. United States, 767 F.3d 1, 18 (D.C.Cir.2014).
So why the different result here?' The answer is the standard of review. The en banc Court came down the way it did, and I voted the way I did, because al Bahlul had forfeited his ex post facto challenge by failing to raise it before the Commission, so our review was for plain error. Applying that highly deferential standard, the Court concluded that it was “not ‘obvious’ ” that conspiracy was “not ... triable by law-of-war military commissions” at the time al Bahlul committed his crimes. Id. at 27.
The government insists that al Bahlul also failed to raise his Article III argument below. But even if that were true, the Article III claim is structural, see Reid v. Covert, 354 U.S. 1, 21, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (“Every extension of military jurisdiction is an encroachment on the jurisdiction of civil courts.... ”), and the Supreme Court held in Commodity Futures Trading Commission v. Schor that structural claims cannot be waived or forfeited, see 478 U.S. 833, 850-51, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (“To the extent that [a] structural principle is implicated in a given case, the parties cannot by consent cure the constitutional difficulty.”). This Court followed suit in Kuretski v. Commissioner of Internal Revenue Service, holding that “the Supreme Court has recognized an exception” to the “general rule” that a party may forfeit an argument it fails to raise below: we may nonetheless “hear ‘a constitutional challenge’ ... if the ‘alleged defect ... goes to the validity of the ... proceeding.’ ” 755 F.3d 929, 936 (D.C.Cir.2014) (quoting Freytag v. Commissioner of Internal Revenue Service, 501 U.S. 868, 879, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991)). The Supreme Court, moreover, recently reaffirmed Schor’s holding in Wellness International Network, Ltd. v. Sharif: “a litigant’s waiver of his ‘personal right’ to an Article III court is not always dispositive!;] • • • [t]o the extent that [a] structural principle is implicated in a given case ... the parties cannot by consent cure the constitutional difficulty.” 575 U.S. -, 135 S.Ct. 1932, 1943, 191 L.Ed.2d 911 (2015) (quoting Schor, 478 U.S. at 850-51, 106 S.Ct. 3245); see id., dissenting op. at 1956 (Roberts, C.J.) (“nobody disputes that Schor forbids a litigant from consenting to a constitutional violation when the structural component of Article III is implicated”) (internal quo *24 tation marks omitted); Op. at 5-6'. If, as the dissent argues, the Court'instead intended to hold that structural claims are now forfeitable, see Dissenting Op. 34-35, thus overruling decades of precedent and requiring us to depart from our own case law, then I suspect it would have made that point clear.
Under these circumstances, the en- banc Court’s conclusion that it was neither “clear” nor “obvious” — that is, not “plain” — that the law of war is purely international cannot determine the outcome of this case. However unclear the law and the evidence, we must decide not whether the error below was plain, but whether there was any error at all. In my view, whether Article III prohibits military commissions from trying conspiracy turns on what Ex Parte Quirin says and what Hamdan does not.
Article III provides that Congress “may vest[ ] ... the judicial power of the United States ... only in courts whose judges enjoy the protections set forth in that Article.” Stern v. Marshall, — U.S. -, 131 S.Ct. 2594, 2620, 180 L.Ed.2d 475 (2011) (emphasis added). The Supreme Court has ruled time and again that this mandate is essentially ironclad, allowing exceptions only where “delineated in [the Court’s] precedents, rooted in history and the Constitution.” Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 74, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). One such exception— the only one relevant here — permits Congress to assign certain criminal cases to military commissions. See Al Bahlul, 767 F.3d at 7. The question in this case is whether conspiracy to commit war crimes falls within the military-commission exception to Article III as articulated by the Supreme Court.
The search for precedent on that question begins and, for the most part, ends with Ex Parte Quirin. Although the en banc Court considered Quirin in some depth, our review here must be more searching, and that heightened standard leads me to a different result.
.In Quirin, the Supreme Court described the contours of the military-commission exception: commissions, the Court ruled, may try enemy belligerents for violations of the “law of war.” Ex Parte Quirin, 317 U.S. 1, 63 S.Ct. 2, 87.L.Ed. 3 (1942). That holding, of course, goes only so far. Because the conviction the Court sustained was for passing behind enemy lines out of uniform in order to attack military assets, and because the Court assumed that that crime violated the international law of war- — whatever the contemporary scholarly view — it had no reason to decide whether the law-of-war exception was limited to international law. See Quirin, 317 U.S. at 36-37, 63 S.Ct. 2; Op. at 7-8.
That question is critical here because in defending the constitutionality of MCA section 950, the government concedes that conspiracy does not violate the international law of war, thus implicitly acknowledging that by enacting that provision, Congress was not exercising its Article I authority to “define” the law of war. Given this, the issue before us is not whether this court must defer to Congress’s “definition” of international law, but whether, as the government insists, the law of war includes some domestic crimes.
In my view, the weight of the Court’s language in Quirin strongly indicates that the law-of-war exception is exclusively international. Making this point repeatedly, the Court observed that in sending Quirin and his fellow saboteurs to a military commission, Congress had permissibly “exercised its authority ... by sanctioning ... the jurisdiction of military commissions to try persons for offenses which, according to the rules and precepts of the law of *25 nations, and more particularly the law of war, are cognizable by such tribunals.” Id. at 28, 63 S.Ct. 2 (emphasis added); see also id. at 29, 63 S.Ct. 2 (calling the law of war a “branch of international law”). The Court made the point even clearer in Ya-mashita: military-commission authority derives from “the Law of Nations ... of which the law of war is a part.” 327 U.S. 1, 7, 66 S.Ct. 340, 90 L.Ed. 499 (1946) (alteration in original) (emphasis added); see also Op. at 8-9.
Still, the Supreme Court never held— because it had no need to — that military commissions are barred from trying crimes recognized only by domestic law. Instead, it left that question for another day. That day looked like it would come in 2006 when the Court took up the case of Salim Hamdan, Osama Bin Laden’s personal driver, who was convicted of, among other things, conspiring to commit acts of terrorism. Like al Bahlul, Hamdan argued that the military commission that convicted him lacked jurisdiction because conspiracy was not a violation of the law of war. The Court, however, never reached that issue because it resolved the case on statutory grounds, i.e., it held that the commission’s procedures ran afoul of the Uniform Code of Military Justice. In other words, the Court ruled that domestic law could limit military commission jurisdiction, but it had no reason to decide whether it could extend it.
The government, though agreeing that the Hamdan Court never directly held that the law of war includes domestic precedent, nonetheless argues that “seven justices ... agreed that resolution of the question did not turn solely on whether conspiracy was a violation of international law.” Respondent’s Br. 41. As the government points out, Justice Thomas, writing on behalf of himself and two other Justices, did embrace this proposition. See Hamdan, 548 U.S. at 689, 126 S.Ct. 2749 (Thomas, J., dissenting) (“The common law of war as it pertains to offenses triable by military commission is derived from the experience of our wars and our wartime tribunals, and the laws and usages of war as understood and practiced by the civilized nations of the world.”) (citation and internal quotation marks omitted). But Justice Kennedy, writing for himself and three other Justices, relied on Quirin for the proposition that the law of war “derives from ‘rules and precepts of the law of nations ’; it is the body of international law governing armed conflict,” id. at 641, 126 S.Ct. 2749 (Kennedy, J., concurring) (quoting Quirin, 317 U.S. at 28, 63 S.Ct. 2) (emphases added) — a definition that rules out resort to domestic law.
To be sure, Justice Stevens observed that “[t]he crime of ‘conspiracy’ has rarely if ever been tried as such in this country by any law-of-war military commission.” Id. at 603, 126 S.Ct. 2749 (Stevens, J., plurality opinion). The government, however, reads far too much into this reference to domestic practice, for in the very same sentence Justice Stevens emphasized that “international sources” — the Geneva Conventions and the Hague Conventions, which he described as “the major treaties on the law of war” — “confirm ” that conspiracy “is not a recognized violation of the law of war.” Id. at 610, 126 S.Ct. 2749 (emphasis added). Justice Stevens described Quirin in similar terms: sabotage was triable by military commission in that case because it “was, by universal agreement and practice both in this country and internationally, recognized as an offense against the law of war.” Id. at 603, 126 S.Ct. 2749 (quoting Quirin, 317 U.S. at 30, 63 S.Ct. 2) (emphasis added) (internal quotation marks omitted). By stating that international law “confirms” that conspiracy is not a violation of the law of war, and by describing the Quirin sabotage as a *26 violation of the law of war because it was treated as such “both in this country and internationally,” Justice Stevens was saying that, at a minimum, an act must violate the international law of war before Congress can grant military commissions jurisdiction over that crime. In other words, Justice Stevens did not conclude that domestic law alone could support military-commission jurisdiction over conspiracy. This interpretation of Justice Stevens’s opinion seems especially obvious given that the three Justices who signed onto his opinion also joined Justice Kennedy’s statement that the law of war “is ... international law,” id. at 641, 126 S.Ct. 2749 (Kennedy, J.,, concurring), and not Justice Thomas’s opinion to the contrary.
Thus, although the Court held in Ham-dan that domestic law — namely, the UCMJ — can limit the scope of military-commission jurisdiction, only three Justices would have extended that jurisdiction beyond the international law of war to the “American common law of.war.” Given this, and given that Article III courts.are the default, that exceptions must be “delineated in [the Court’s] precedents,” Northern Pipeline, 458 U.S. at 74, 102 S.Ct. 2858, and that the Schor balancing factors favor al Bahlul, see Op. at 20-22, this “inferior” court is without authority to go beyond the Supreme Court’s clear signal, sent first in Quirin and repeated in Yama-shita, that military-commission jurisdiction is limited to crimes that violate the international law of war. See United States v. Dorcely, 454 F.3d 366, 375 (D.C.Cir.2006) (the Supreme Court’s “carefully considered language ... must be treated as authoritative”). Instead, we must leave it to the Supreme Court to take that step.
Moreover, and again proceeding on de novo review, I see nothing in Article I of the Constitution that requires a different result. Judge Rogers demonstrates this convincingly. See Op. at 12-16. I add only that were the government correct about Article I, Congress would have virtually unlimited authority to bring any crime within the jurisdiction of military commissions — even theft or murder — -so long as it related in some way to an ongoing war or the armed forces. Congress could simply declare any crime to be a violation of the law of war and then vest military commissions with jurisdiction to try it, thereby gutting Article Ill’s critical protections. The Supreme Court rejected that view of Article I in Northern Pipeline. There, the Court concluded that Congress had no authority to establish bankruptcy courts entirely outside of Article Ill’s reach because any limit on such “broad legislative discretion” would prove “wholly illusory.” Northern Pipeline, 458 U.S. at 73-74, 102 S.Ct. 2858. Like the bankruptcy scheme the Court rejected in Northern Pipeline, the government’s view of Article I would “effectively eviscerate [Article Ill’s] guarantee of an independent Judicial Branch of the Federal Government.” Id. at 74,102 S.Ct. 2858.
Although the foregoing is sufficient to resolve this case, the government makes one more argument that deserves attention. Limiting commission jurisdiction to offenses that violate international law, it asserts, “would ... inappropriately restrict Congress’s ability, in the absence of broad concurrence by the international community, to adapt ... [to] future changes in the practice of modern warfare and the norms that govern it.” Respondent’s Br. 38; see also Dissenting Op. at 43-44. I agree with the government’s premise: that as a result of today’s decision, Congress will be unable to vest military commissions with jurisdiction over crimes that do not violate the international law of war. But as explained above, that is precisely what the Constitution, as interpreted by the Supreme Court, requires.
*27 Despite the government’s protestations, moreover, this court’s holding will not “inappropriately restrict” the nation’s ability to ensure that those who conspire to commit terrorism are appropriately punished. After all, the government can always fall back on the apparatus it has used to try federal crimes for more than two centuries: the federal courts. See 18 U.S.C. § 371 (criminalizing conspiracy). Federal courts hand down thousands of conspiracy convictions each year, on everything from gun-running to financial fraud to, most important here, terrorism. See Center on Law and Seourity, New Yore University Sohool of Law, Terrorist Trial Report Card: September 11, 2001-September 11, 2011 at 2, 7, table 1, available at http://goo. gl/Ks30kc (since September 11, 2001, prosecutors have prevailed in almost 200 “jihadist-related” terrorism and national-security cases in federal courts); id. at 13 (“the most commonly charged crimes” have included violations of 18 U.S.C. § 371, for “general criminal conspiracy”). For instance, Zacarías Moussaoui — the potential 20th 9/11 hijacker — pled guilty in federal court to six counts of conspiracy for his role in planning the 2001 attacks, see United States v. Moussaoui, 591 F.3d 263, 266 (4th Cir.2010); a federal jury convicted Wadih el Hage, Mohamed Odeh, and Mohamed al Owhali for conspiring to bomb the American embassies in Kenya and Tanzania, see In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 93, 107 (2d Cir.2008); and Ahmed Abu Khattalah, who stands accused of conspiring to attack the American diplomatic mission in Benghazi, Libya, awaits trial in this very courthouse, see Superseding Indictment, United States v. Ahmed Abu Khattala, No. 14-cr-141 (D.D.C. Oct. 14, 2014), ECF No. 19.
By contrast, although the detention camp at the U.S. naval station at Guantá-namo Bay has held at least 780 individuals since opening shortly after September 11th, and although military prosecutors have brought charges against some two hundred, the commissions have convicted only eight: al Bahlul, Hamdan, Noor Uth-man Muhammed, David Hicks, Omar Khadr, Majid Khan, Ibrahim al Qosi, and Ahmed al Darbi. See Miami Herald, Guantanamo: By the Numbers, http://goo. gl/SEPfV6 (last updated May 12, 2015). Furthermore, due to various questions about the military-commission process itself, as of this writing only three of those convictions — Khan’s, al Darbi’s, and al Qosi’s — remain on the books and unchallenged.